1  Thomas Corcovelos (CA Bar No. 70493)
   CORCOVELOS LAW GROUP
2  1001 Sixth Street, Suite 150
   Manhattan Beach, California 90266-6750
3  Telephone: (310) 374-0116
   Telecopier: (310) 318-3832
4  Email:  corforlaw@corforlaw.com

5
   Attorney for Mammoth San Juan Capistrano I, LLC.
6  Debtor and Debtor in Possession

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  SANTA ANA DIVISION

11
   In re: Mammoth San Juan Capistrano I, LLC        Case No.: 8:09-bk-16836-rk
12                                                   Chapter 11
                      Debtor
13                                                   **DEBTOR'S THIRD AMENDED
                                                     DISCLOSURE STATEMENT
14                                                   DESCRIBING DEBTOR'S CHAPTER 11
                                                     PLAN OF REORGANIZATION**
15
                                                     Disclosure Statement Hearing
16                                                   Date: June 16, 2010

17                                                   Time:  11:00 AM

18
                                                     Place:  Ronald Reagan Federal Building
19                                                   United States Courthouse
                                                     411 West Fourth Street, Courtroom #5D
20                                                   Santa Ana, CA 92701-4593

21                                                   Plan Confirmation Hearing

22                                                   [See Disclosure Statement for Voting and
23                                                   Objection Procedures]

24                                                   Date:   TBD

25                                                   Time:

26                                                   Place:

27

28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ **5**

**BACKGROUND** ................................................................................................ **34**

**A. Description and History of the Debtor's Business** ........................ **34**

**B. Principals/Affiliates of Debtor's Business** ................................. **39**

**C. Management of the Debtor Before and After the Bankruptcy** ...... **39**

**D. Events Leading to Chapter 11 Filing** ........................................ **39**

**E. Significant Events** ................................................................ **47**

　.Bankruptcy Proceedings ........................................................ 47

　.   Other Legal Proceedings .................................................. 48

　.Actual and Projected Recovery of Preferential or Fraudulent

　Transfers ............................................................................ 49

　.Procedures Implemented to Resolve Financial Problems .......... 50

　5.Current and Historical Financial Conditions .......................... 50

SUMMARY OF THE PLAN OF REORGANIZATION ..................................... **51**

**A. What Creditors and Interest Holders Will Receive Under The Proposed**

**Plan** ........................................................................................ **51**

**B.   Unclassified Claims** .......................................................... **51**

　.   Administrative Expenses .................................................. 52

　.   Priority Tax Claims .......................................................... 53

**C.   Classified Claims and Interests** ....................................... **54**

　　Classes of Secured Claims ................................................. 54

**D.   Means of Effectuating the Plan** ......................................... **70**

　Funding for the Plan ............................................................ 70

　Post-Confirmation Management ............................................ 70

　Disbursing Agent ................................................................ 71

**E. Risk Factors** ...................................................................... **71**

**F.   Other Provisions of the Plan** ............................................ **72**

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

.Executory Contracts and Unexpired Leases ................................72

   a.Assumptions ................................................72

   b.Rejections ................................................73

.Changes in Rates Subject To Regulatory ................................73

.   Retention of Jurisdiction ................................73

G.Tax Consequences of Plan ................................**73**

CONFIRMATION REQUIREMENTS AND PROCEDURES ................................**74**

A.   Who May Vote or Object ................................**75**

.Who May Object to Confirmation of the Plan ................................75

.Who May Vote to Accept/Reject the Plan ................................75

   a.What Is an Allowed Claim/Interest ................................75

   b.What Is an Impaired Claim/Interest ................................76

.Who Is Not Entitled to Vote ................................77

.   Who Can Vote in More Than One Class ................................77

.Votes Necessary to Confirm the Plan ................................77

.Votes Necessary for a Class to Accept the Plan ................................78

.Treatment of Nonaccepting Classes ................................78

.Request for Confirmation Despite Nonacceptance by Impaired

Class(es) ................................78

B.   Liquidation Analysis ................................**79**

C.   Feasibility ................................**86**

EFFECT OF CONFIRMATION OF PLAN ................................**88**

A.   Discharge ................................**88**

B.   Revesting of Property in the Debtor ................................**88**

C.   Modification of Plan ................................**88**

D.Post-Confirmation Status Report ................................**88**

E.   Post-Confirmation Conversion/Dismissal ................................**89**

F.   Final Decree ................................**90**

**EXHIBIT A – LIST OF ALL ASSETS** ....................................................................**92**

**EXHIBIT B – List of Litigation** .................................................................**95**

**EXHIBIT C – Financial Projections** ...........................................................**102**

**EXHIBIT D – Unexpired Leases to be Assumed** ..................................**103**

**EXHIBIT E – Unsecured Creditors** ..........................................................**104**

**EXHIBIT F – List of Equity Interest Holders** .....................................**105**

**EXHIBIT G – Last 2 years Financial Statements** ...............................**107**

**EXHIBIT H – Agreement For Restructuring** ........................................**108**

**I.**

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

**I.**

**INTRODUCTION**

MAMMOTH SAN JUAN CAPISTRANO I LLC the Debtor in this Case[1], provides this Disclosure Statement to all of its Creditors, Equity Security Holders, and to other parties in interest in the Case.

The Debtor commenced its Bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code, ("Code") Sections 101-1330, on July 8, 2009 (the "Petition Date").   The Debtor is continuing in the operation and management of its business pursuant to Bankruptcy Code Sections 1107 and 1108.

Section 1125 of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement[2].   The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the

---

[1]    The definitions of the capitalized terms used in this Disclosure Statement are contained in Section II. of this Disclosure Statement.

[2]    Section 1125(b) provides, in pertinent part, as follows:

a)        An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

11 U.S.C. § 1125(b) (2003).

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Debtor's books and records, to enable a typical Creditor or Equity Security Holder to make an informed judgment about the Plan and to enable such Creditor or Equity Security Holder to determine whether it is in his best interest to vote for (accept) or against (reject) the Plan.

Chapter 11 of the Bankruptcy Code allows debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization.  The plan may provide for debtors to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtor is the party proposing the Plan sent to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.  This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan.  The Debtor urges you to read this Disclosure Statement because it contains important information concerning the Debtor's history, business, assets, and liabilities and sets forth a summary of the Plan.

The Debtor's Plan is a reorganization plan accomplished through the continuation of Debtor's primary business, the management and lease-up of commercial real estate. In other words, the Plan Proponent (i.e., the Debtor) seeks to accomplish payment under the Plan primarily through the New Value contribution(s) cash flow generated from the leasing of the Mammoth Property and through proceeds from a future sale or refinance of the Mammoth Property.  The Plan may provide for the

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  Debtor to reorganize by continuing to operate and refinance or,

2  to liquidate by selling assets of the estate, or a combination of

3  both.  The Debtor, MAMMOTH SAN JUAN CAPISTRANO I LLC is the party

4  proposing the Plan sent to you in the same envelope as this

5  document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE

6  STATEMENT FOR THE ENCLOSED PLAN.

7  This is a New Value reorganization plan.  In other words, the

8  Plan Proponent (i.e., the Debtor) seeks to accomplish payment

9  under the Plan primarily through the $1,000,000 New Value

10 contribution paid to JP Morgan chase in accordance with the

11 Agreement for Restructuring, additional New Value contributions

12 if needed, and the continuation of Debtor's primary business, the

13 ownership of two class-A multitenant office buildings.   The

14 Distributions under the Plan will be made from New Value,

15 available Cash flow, and or refinance or Net Sales Proceeds. The

16 Effective Date of the proposed Plan is August 30, 2010.

17     The Distributions under the Plan will be made from available

18 Cash the New Value contribution, lease income, refinance

19 proceeds, and Net Sale Proceeds.

20     The Plan will be implemented through the following means:

21         •   The Managing Member of the Debtors current

22 manager, Robert Wish will provide oversight and assistance in the

23 operation of the Debtor's business and day-to-day management

24 decisions.  Robert Wish will work to lease the remaining vacant

25 space in the Mammoth Property.

26         •   The proceeds generated from the New Value

27 contribution(s), leases on the Mammoth Property and any future

28

refinance or sales proceeds generated by the Mammoth Property will be used to fund the payments to both Secured and Unsecured Creditors provided for under the Plan.  It is anticipated that there will be sufficient funds from these proceeds to pay all Allowed Secured and Allowed Unsecured Claims as follows:

• Secured Creditor JP Morgan Chase, shall be paid $1,000,000 on the Effective Date and be in full the balance owing on or before the 42nd month following the Effective Date, The Orange County Tax Collector will be paid in full on or before the 42nd month following the Effective Date. The Orange County Tax Collector will be paid in full on or before the 42nd month following the Effective Date.

• Allowed Class 4 General Unsecured Claims may elect to receive a one-time lump sum payment equal to 50% of their allowed claim as payment in full on the 12th month following the Effective Date or 100% of their allowed claim as payment in full on or before the 42nd month following the Effective Date.

• Allowed Class 5 Claims shall receive 100% of their claims in full on or before the 42nd month following the Effective Date only after payment in full to Class 1, 2, 3, and 4 Claimants.

**A MORE COMPLETE DESCRIPTION OF THE PROVISIONS OF THE PLAN AND THE MEANS OF EFFECTUATING THE PLAN ARE LOCATED AT SECTION IV.D. BELOW.**

**A.** **Purpose of this Document**

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the

process the Court follows in determining whether or not to confirm the Plan. This Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtor's business operations, the applicable provisions of the Bankruptcy Code, or any other matter which may be deemed significant by Creditors or Interest Holders. Out of practical necessity, this Disclosure Statement represents an attempt to summarize extensive overall data, legal documents and legal principles, including provisions of the Bankruptcy Code, and to set them forth in understandable, readable form.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

1. **WHO CAN VOTE OR OBJECT;**

2. **WHAT THE TREATMENT OF YOUR CLAIM IS, (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

3. **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

4. **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

5. **WHAT IS THE EFFECT OF CONFIRMATION; AND**

6. **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

what is the best course of action for you.  Be sure to read the Plan as well as all of this Disclosure Statement.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court has conditionally approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  Any party can now solicit votes for or against the Plan.  However, the statements and conclusions set forth in this document are, unless otherwise noted, those of the Proponent of the Plan.  The accuracy has not yet been determined by the Court, and the Court may determine such accuracy at the hearing regarding whether or not to confirm the Plan.

**B.**  **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THE CASE.**

**1.**  **Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, 2009, at _____ A.M., Courtroom _____

Deadline for Voting for or Against the Plan

(1)  If you are entitled to vote, it is in your best interest to vote timely on the enclosed ballot

10

**(2)** and return the ballot in the enclosed envelope to **Corcovelos Law Group**, to the attention of Tom Corcovelos 1001 Sixth Street, Suite 150  Manhattan Beach, CA 90266 Telephone: (310)-374-0116. Your ballot must be received by _____, 2009, at 5:00 P.M. California time, or it will not be counted.

**(3)** Since mail delays may occur, and because time is of the essence, it is important that ballots be mailed well in advance of the date specified hereinabove as the deadline for **Corcovelos Law Group** to receive ballots.  Any ballots received after that date will not be included in any calculation to determine whether the Debtor's Creditors and Interest Holders have accepted or rejected the Plan.

    **2.** <u>**Deadline for Objecting to the Confirmation of the Plan**</u>

Objections to the confirmation of the Plan must be filed with the Court and served upon **Corcovelos Law Group**, to the attention of Thomas C Corcovelos  1001 Sixth Street, Suite 150  Manhattan Beach, CA 90266, Telephone: (310)-374-0116, by _____, 2009, at 5:00 P.M. California time.

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes of Claims and Interests created under the Plan, and if not, whether the Bankruptcy Court should nevertheless confirm the Plan.  If at the Confirmation Hearing the Bankruptcy Court determines that the Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will enter a Confirmation Order.  Pursuant to Section 1141 of the Bankruptcy

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  Code, the effect of the Confirmation Order will be to make the

2  provisions of the Plan binding upon the Debtor and each of its

3  Creditors and Interest Holders, regardless of whether each

4  Creditor or Interest Holder voted to accept the Plan.

5  **3.    Identity of Person to Contact for More Information**

6  **Regarding the Plan**

7  Any interested party desiring further information about the

8  Plan may contact Thomas C Corcovelos at **Corcovelos Law Group**,

9  1001 Sixth Street, Suite 150 Manhattan Beach, CA 90266,

10  Telephone: (310)-374-0116

11

12  C.  **Disclaimer**

13  The Plan involves the payment of Claims from available Cash,

14  from cash flow generated through the leasing of the Mammoth

15  Property, from a refinance of the mammoth Property, or  from the

16  Net Sales Proceeds from the sale of the Mammoth Property .  The

17  Debtor projects that there will be sufficient funds available to

18  make the payments called for under the Plan.  The Debtor's

19  financial projections filed in support of the Plan (included in

20  **Exhibit B** attached hereto) were prepared by the Debtor.

21

22  THE PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT REPRESENT

23  A PREDICTION OF FUTURE EVENTS BASED UPON CERTAIN ASSUMPTIONS SET

24  FORTH WITH SUCH PROJECTIONS.  THESE FUTURE EVENTS MAY OR MAY NOT

25  OCCUR, AND THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE

26  OR OTHER ASSURANCE OF THE ACTUAL RESULTS WHICH WILL OCCUR.

27  BECAUSE OF THE UNCERTAINTIES INHERENT IN PREDICTIONS OF FUTURE

28  EVENTS, THE DEBTOR'S ACTUAL CASH FLOW MAY WELL BE DIFFERENT FROM

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF THE CREDITORS.

The projections are intended to assess the future cash flow available to the Debtor for making the distributions required by the Plan.  Significant assumptions underlying the financial projections include the following:

1.    Effective Date of the Plan

For the purpose of the Projections, the Debtor estimates that the Confirmation Date will occur in or about June 30, 2010 and hence, that the Effective Date will occur in or about August 30, 2010 with first payments under the plan being made on September 30, 2010.

2.    Earnings Generated by the Mammoth Property

The Debtor's projection of the future earnings which will be generated by the Mammoth Property is derived from Debtor's estimate of the revenue which the Mammoth Property will generate after the Confirmation Date.

3.    Expenses of the Debtor

The Debtor has assumed, for the purpose of the Projections that their expenses will not increase by any significant amount, except as specifically set forth in the Projections, during the term of the Plan.

The information contained in this Disclosure Statement is provided by the Debtor.  The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

recommendation as to whether or not you should support or oppose the Plan.

The financial data relied upon in formulating the Plan is based on the Debtor's post-petition financial projections, the Debtor's Bankruptcy Schedules, Robert Wish's development and management experience, and the financial information contained in pleadings filed with the Bankruptcy Court. This information was not audited or reviewed by an independent accountant and the Debtor is unable to warrant or represent that such financial information is without any inaccuracies, although Debtor believes it has made reasonable efforts under the circumstances to present such financial information fairly and accurately. The Debtor represents that everything stated in the Disclosure Statement is true to the best of Debtor's knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**THIS IS A SOLICITATION BY THE DEBTOR. THE REPRESENTATIONS HEREIN ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS OR CONSULTANTS. NO REPRESENTATIONS CONCERNING THE DEBTOR OR POST-CONFIRMATION DEBTOR, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO THE POST-CONFIRMATION DEBTOR'S FUTURE ACTIVITIES, THE VALUE OF ITS PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE DEBTOR'S ESTATE, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF**

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

THE PLAN THAT ARE IN ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY IN INTEREST.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE DEBTOR'S ATTORNEYS WHO, IN TURN, WILL DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT REGARDING THE DEBTOR HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT. RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE DEBTOR.  THE DEBTOR BELIEVES THAT EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION AS ACCURATELY AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS.  HOWEVER, THE FINANCIAL INFORMATION CONTAINED HEREIN REGARDING THE DEBTOR IS NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY.  COUNSEL FOR THE DEBTOR HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN AND MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW CAREFULLY THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO VOTING ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS, OR TAX ADVICE.  EACH CREDITOR AND OTHER PARTY IN INTEREST SHOULD CONSULT WITH HIS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT, AND/OR ACCOUNTANT PRIOR TO VOTING TO ENSURE A COMPLETE UNDERSTANDING OF

**THE TERMS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS AND INTEREST HOLDERS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION OF ACCEPTANCES TO THE PLAN BY THE DEBTOR, ASSUMING IT IS ACCURATE.  HOWEVER, THE BANKRUPTCY COURT HAS NOT YET DETERMINED THE ACCURACY OF SUCH INFORMATION.  IT MAY DO SO AT THE CONFIRMATION HEARING.**

DEFINITIONS, INTERPRETATIONS, AND RULES OF CONSTRUCTION

1. "**Administrative Claim**" means a Claim for costs and expenses of the administration of the Case under Sections 503(b) or 507(b), including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries, or commissions for services); (b) all Claims of professionals employed at the expense of the Estate; and (c) any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

2. "**Agreement for Restructuring**" means the Agreement for Restructuring Loan Nos. 625028951 and 625028961 attached hereto as Exhibit "A."

3. "**Allowed Administrative Claim**" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(b).

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET·SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

4.  **"Allowed Amount"** means the amount of any Claim against the Debtor determined in accordance with Sections 502 and 506(a) and any other applicable Section of the Bankruptcy Code.

5.  **"Allowed Claim"** means a Claim: (a) with respect to which a Proof of Claim has not been filed but the Claim has been listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, or unliquidated as to amount and as to which no objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order; or (b) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order.

6.  **"Allowed Class      Claim"** means an Allowed Claim in the particular Class described.

7.  **"Allowed Class       Interest"** means an Allowed Interest in the particular Class described.

8.  **"Allowed General Unsecured Claim"** means an unsecured Allowed Claim against the Debtor, however arising, not entitled to priority under Section 507(a), including an Allowed Claim based on the rejection of an executory contract or unexpired lease.

9.  **"Allowed Priority Claim"** means an Allowed Administrative Claim, Allowed Priority Tax Claim, or Allowed Priority Unsecured Claim.

10. "**Allowed Priority Tax Claim**" means an Allowed Claim entitled to priority pursuant to Section 507(a)(8).

11. "**Allowed Priority Unsecured Claim**" means an Allowed Claim entitled to priority pursuant to Sections 507(a)(3), 507(a)(4), or 507(a)(6).

12. "**Allowed Secured Claim**" means an Allowed Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under Section 553, to the extent of the value, determined in accordance with Section 506(a), of the interest of the holder of such Allowed Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

13. "**Avoidance Action**" means any action which is filed or which may be filed pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549, or 550, any actions based on applicable non-Bankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code, or any other similar action or proceeding filed to recover property for or on behalf of the Estate or to avoid a lien or transfer.

14. "**Ballot**" means the form distributed to holders of Claims or Interests on which is to be stated an acceptance or rejection of the Plan.

15. "**Bankruptcy Code**" means title 11 of the United States Code, as now in effect or hereafter amended.

16. "**Bankruptcy Court**" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division,

18

which has jurisdiction over the Case and the Estate of the Debtor, or such successor court or tribunal as may hereafter be confirmed or created by lawful authority with power to confirm reorganization plans under chapter 11 and all applicable statutes, rules, and regulations pertaining thereto.

17. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for use in the Bankruptcy Court, as now in effect or hereafter amended.

18. "**Bar Date**" means the last date for filing Proofs of Claim other than Administrative Claims or Claims based upon the rejection of any executory contracts or unexpired leases. The Bar Date for filing Proofs of Claim was set by the Bankruptcy Court as _____.

19. "**Business Day**" means any day other than a Saturday, Sunday, or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

20. "**Case**" means the Debtor's bankruptcy case which was commenced on the Petition Date and assigned as Case 8:09-bk-16836.

21. "**Cash**" means Cash and Cash equivalents, including checks or similar forms of payment or exchange.

22. "**Claim**" means: (a) a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether

or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

23. "**Claimant**" means the holder of a Claim.

24. "**Class**" means a grouping into which Claims or Interests which are substantially similar to other Claims or Interests have been classified pursuant to Article IV of the Plan.

25. "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court.

26. "**Confirmation Date**" means the date on which the Confirmation Order is entered on the court's docket in the Case.

27. "**Confirmation Hearing**" means the hearing, including any continued or postponed session thereof, at which the Bankruptcy Court will consider and determine whether to confirm the Plan.

28. "**Confirmation Order**" means the order, as entered, of the Bankruptcy Court confirming the Plan pursuant to Section 1129.

29. "**Consent to 362 Relief**" means the agreement by the Debtor and JPMorgan Chase that any bankruptcy case filed after the Effective Date shall be commenced only in the Bankruptcy Court, and the Debtor shall not oppose a relief from stay in any future bankruptcy case if, prior to one or both of the Loans being paid in full:

(a)   The Debtor re-files for bankruptcy protection; or

(b)   (i) the Debtor or any Debtor Affiliate shall commence any case, proceeding or other action (A) under any

existing or future law of any jurisdiction, domestic or foreign,
relating to bankruptcy, insolvency, reorganization,
conservatorship or relief of debtors, seeks to have an order for
relief (or similar order) entered with respect to it, or seeks to
adjudicate it a bankrupt or insolvent, or seeks reorganization,
arrangement, adjustment, winding-up, liquidation, dissolution,
composition or other relief with respect to it or its debts, or
(B) (i) seeks appointment of a receiver, trustee, custodian,
conservator or other similar official for it or for all or any
substantial part of its assets, or any Debtor Affiliate shall
make a general assignment for the benefit of its creditors; or
(ii) there shall be commenced against any Debtor Affiliate any
case, proceeding or other action of a nature referred to in
clause (i) above which results in the entry of an order for
relief or any such adjudication or appointment; or (iii) there
shall be commenced against any Debtor Affiliate any case,
proceeding or other action seeks issuance of a warrant of
attachment, execution, distraint or similar process against all
or any substantial part of its assets which results in the entry
of any order for any such relief; or (iv) any Debtor Affiliate
shall take any action in furtherance of, or indicating its
consent to, approval of, or acquiescence in, any of the acts set
forth in clause (i), (ii) or (iii) above; or (iv) any Debtor
Affiliate shall generally not, or shall be unable to, or shall
admit in writing its inability to, pay its debts as they become
due, or (C) (i) seeks appointment of a receiver, trustee,

custodian, conservator or other similar official for it or for all or any of the Properties; or

(ii) there shall be commenced against any Debtor Affiliate any case, proceeding or other action of a nature referred to in clause (i) above which results in the entry of an order for relief or any such adjudication or appointment; or (iii) there shall be commenced against any Debtor Affiliate any case, proceeding or other action seeks issuance of a warrant of attachment, execution, distraint or similar process against all or any part of the Properties which results in the entry of any order for any such relief.

30. "**Creditor**" means the holder of an Allowed Claim.

31. "**Debtor**" means MAMMOTH SAN JUAN CAPISTRANO I LLC, the debtor in the Case.

32. "**Debtor Affiliate**" means each and all of the following: (i) Mammoth Equities; and (ii) each subsidiary, general partner or managing member of the Debtor.

33. "**Disallowed Claim**" means a Claim against the Debtor, which Claim is disallowed pursuant to an order of the Bankruptcy Court as to which eleven (11) calendar days have passed following entry of such order and no stay pending an appeal of such order is obtained during such period.

34. "**Disbursing Agent**" means the person or entity charged with making Distributions pursuant to the terms of the Plan. Pursuant to the Plan, the Reorganized Debtor will serve as the Disbursing Agent under the Plan.

35. "**Disclosure Statement**" means the Disclosure Statement (and all exhibits or schedules annexed thereto or referenced therein) which accompanies the Plan, as the Disclosure Statement may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

36. "**Disputed Claim**" means any Claim: (a) listed on the Debtor's Schedules as unliquidated, disputed, or contingent; or (b) as to which the Debtor, or any other party in interest, has interposed a timely objection or request for estimation or subordination in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation or subordination has not been withdrawn or determined by a Final Order. A Claim will be considered a Disputed Claim in its entirety if an objection is timely filed to any portion of such Claim.

37. "**Disputed Claims Reserve Account**" means the segregated account to be created for holding the pro-rata share of any Disputed Claims pending final resolution of the Disputed Claim.

38. "**Distribution**" means the Cash which is required to be distributed under the Plan to the holders of Allowed Claims.

39. "**Effective Date**" means the date not later than ninety (90) days following the date upon which the Confirmation Order becomes a Final Order; provided, however, that, if an appeal of the Confirmation Order is timely filed, the Debtor may elect to cause the Plan to become effective, notwithstanding the pendency of such appeal, so long as no stay of the Confirmation Order is in effect, by filing with the Bankruptcy Court a notice of such

election, in which event the Plan will become effective as provided herein.

40. "**Effective Date Payment**" means the payment of $1 million to the holders of Note 1 and Note 2, to be applied pursuant to the Agreement for Restructure to: (i) accrued past due interest on the Loans, (ii) accrued late fees and penalties on the Loans, (iii) attorneys fees of counsel for JPMorgan Chase, (iv) third party costs and expenses incurred by JPMorgan Chase (e.g., appraisals), and (v) the outstanding principal balance of the Loans.

41. "**Equity Security Holder**" means the holder of an Interest in the Debtor.

42. "**Estate**" means the estate created under Section 541 in the Case.

43. "**Exhibits**" means those exhibits annexed to the Plan or Disclosure Statement or incorporated by reference in the Plan or Disclosure Statement.

44. "**File**," "**Filed**," or "**Filing**" means filed with the Bankruptcy Court having jurisdiction over the Case.

45. "**Final Distribution**" means, for each Class, the last Distribution to be made to holders of Allowed Claims in that Class.

46. "**Final Order**" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which the Debtor is a party, which has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, petition for certiorari, or move

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending; or (b) any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor; or (c) any appeal, petition for certiorari, reargument or rehearing has been resolved by the highest court to which the order or judgment was appealed timely or from which certiorari, reargument, or rehearing was sought.

47. "**Financial Projections**" means the financial statements prepared by the Debtor which sets forth, among other things, the Debtor's Cash flow projections, and which is attached as Exhibit "C" hereto.

48. "**General Unsecured Claim**" means an unsecured Claim against the Debtor that is not entitled to priority under Section 507(a), including a Claim based on the rejection of an executory contract or unexpired lease.

49. "**Interest**" means a membership interest in the Debtor.

50. "**JPMorgan Chase**"  means JPMorgan Chase NA the successor in interest to Washington Mutual Bank.

51. "**JPMorgan Allowed Claims**" means each of (i) the Allowed Class 2 Claim in the amount of $16,546,450, plus accrued and unpaid interest, costs and other expenses incurred by JPMorgan Chase in connection with the Loan Documents, and (ii) the Allowed Class 3 Claim in the amount of $9,307,255, plus accrued and unpaid interest, costs and other expenses incurred by JPMorgan

Chase in connection with the Loan Documents, less post-petition payments made by the Debtor through the Effective Date.

52. **"Loan Documents"** means the Note 1 Security Documents and the Note 2 Security Documents.

53. **"Loans"** means each of Note 1 and Note 2 as each may be revised, as set forth in the Agreement for Restructuring.

54. **"Mammoth"** means Mammoth San Juan Capistrano I, the debtor and debtor in possession.

55. **"Mammoth Adversary Proceeding"** means the lawsuit filed in state court against JP Morgan Chase known as   MAMMOTH  SAN JUAN CAPISTRANO, LLC, ETC, AND MAMMOTH EQUITIES,LLC, ETC, ET AL. VS  JP MORGAN CHASE BANK, F.A., ETC, ET AL.," case No. 00120389 that was subsequently filed as an adversary proceeding in bankruptcy court and in the Bankruptcy Court is known as # 8:09-ap-01433-RK.

56. **"Mammoth  Equities"** means Mammoth Equities, LLC the managing member of the Debtor.

57. **"Mammoth Land"** means the land upon which the Mammoth Property was constructed.

58. **"Mammoth Loans"** means the loans encumbering the Mammoth Property, specifically Note 1 and Note 2.

59. **"Mammoth Property"** means Mammoth Property 1 and Mammoth Property 2.

60. **"Mammoth Property 1 "** means the Debtor's real property and improvements, consisting of commercial property located at 29222 Rancho Viejo Road, San Juan Capistrano, CA.

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

61. "**Mammoth Property 2**" means the Debtor's real property and improvements consisting of commercial property located at 29122 Rancho Viejo Road, San Juan Capistrano, CA.

62. "**Net Sales Proceeds**" means all of the Cash proceeds from the sale of the assets of the Estate minus all costs of sale.

63. "**New Value**" or "**New Value Contribution**" means equity to be contributed by the Interest Holders to fund the Plan.

64. "**Note 1**" means that certain promissory note including all amendments and modifications thereto, in the principal amount of $15,040,000 as of the Petition Date.

65. "**Note 2**" means that certain promissory note including all amendments and modifications thereto in the principal amount of $8,460,000 as of the Petition Date.

66. "**Note 1 Security Documents**" means all documents creating or evidencing a first priority lien secured by Mammoth Property 1 as all such documents may have been amended or modified from time to time, including that certain Deed of Trust with Assignment of Rents dated December 13, 2006 given to secure, among other things, the obligations under Note 1.

67. "**Note 2 Security Documents**" means all documents creating or evidencing a first lien secured by Mammoth Property 2 as all such documents may have been amended or modified from time to time, including that certain Deed of Trust with Assignment of Rents dated December 13, 2006 given to secure, among other things, the obligations under Note 2.

68. "**Order**" means an order or judgment of the Bankruptcy Court as entered on the Court's docket.

69. "**Person**" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, government or any political subdivision, governmental unit (as defined in the Bankruptcy Code) or official committee appointed by the United States Trustee.

70. "**Petition Date**" means July 8, 2009, the date on which the Debtor filed its voluntary petition under chapter 11, commencing the Case.

71. "**Plan**" means this Plan of Reorganization, as it may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules and as approved by the Bankruptcy Court at Confirmation.

72. "**Post-Confirmation Estate Claims**" means any and all claims and causes of action which constitute property of the Estate including, but not limited to, any Avoidance Actions, whether or not such claims or causes of action are the subject of litigation pending as of the Effective Date. Any recovery from Avoidance Actions will be utilized to pay the Class 1, 2, 3, and 4 creditors in full.

73. "**Post-Petition Earnings**" means any funds received by Debtor since the Petition Date.

74. "**Remaining Property**" means either Mammoth Property 1 or Mammoth Property 2 as the property remaining after a sale of the other.

75. "**Reorganized Debtor**" means the Debtor, MAMMOTH SAN JUAN CAPISTRANO I LLC, a California Limited Liability Company, on and after the Effective Date.

76. "**Restructured Loans**" means Restructured Note 1 and Restructured Note 2, each as revised as set forth in the Agreement for Restructuring.

77. "**Restructured Note 1**" means Note 1 as revised as set forth in the Agreement for Restructuring.

78. "**Restructured Note 1 Security Documents**" means the Note 1 Security Documents, as amended and restated as set forth in the Agreement for Restructure.

79. "**Restructured Note 2**" means Note 2 as revised as set forth in the Agreement for Restructuring.

80. "**Restructured Note 2 Security Documents**" means the Note 2 Security Documents, as amended and restated as set forth in the Agreement for Restructure.

81. "**Robert Wish**" means Robert Wish, the managing member of Mammoth Equities LLC, the Manager of MAMMOTH SAN JUAN CAPISTRANO I LLC.

82. "**Schedules**" means the (i) Schedules of Assets and Liabilities, and (ii) Statement of Financial Affairs, as amended, modified, or supplemented from time to time.

83. "**Secured Claim**" means a Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under Section 553, to the extent of the value, determined in accordance with Section 506(a), of the interest of the holder of such

Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

84. "**Secured Creditor**" shall mean the holder of an Allowed Secured Claim.

85. "**Tax Collector**" means the Orange County Treasurer/Tax Collector or its successors-in-interest.

86. "**Unclaimed Distribution**" means any Distribution which is unclaimed as a result of any of the following: (a) checks which have been returned as undeliverable without a proper forwarding address; (b) checks which were not mailed or delivered because of the absence of a proper address to which to mail or deliver the same; (c) checks which remain unnegotiated for a period of ninety (90) days after the date of issuance.

87. "**Unclassified Claims**" means the Allowed Amount of (i) all Administrative Claims of the Debtor's Case, allowed pursuant to Section 503(b); and (ii) all Priority Tax Claims entitled to priority pursuant to Section 507(a)(8).

88. "**Unsecured Creditors**" means Creditors holding Allowed Unsecured Claims against the Debtor, but not including Priority Claims.

89. "**Wage Claimant**" means a Claimant asserting a Claim pursuant to Section 507(a)(3) or (a)(4).

Interpretations, Computation of Time and Governing Law

**4.    Undefined Terms**

Any term used in the Disclosure Statement that is not defined in the Disclosure Statement, either in Section II.A (Definitions) or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

**5.    Rules of Interpretation**

For the purposes of the Disclosure Statement:

a. Whenever, from the context, it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural.

b. Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.

c. Any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified, or supplemented as of the Confirmation Date.

d. Unless otherwise specified in a particular reference in the Plan, all references in the Plan to Sections, Articles or Exhibits are references to Sections, Articles and Exhibits of or to the Plan.

e. Unless otherwise specified in a particular reference in the Plan, the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety

1  rather than only to a particular paragraph, subparagraph, or

2  clause contained in the Plan.

3      f. Captions and headings to Articles and Sections are

4  inserted for convenience of reference only and are not intended

5  to be a part of or to affect the interpretation of the Plan.

6      g. The rules of construction set forth in Bankruptcy Code

7  Section 102 shall apply.

8      h. The provisions of the Plan will control over any

9  description thereof contained in the Disclosure Statement.

10      i. Any term used in the Plan that is not defined in the

11  Plan, but that is used in the Bankruptcy Code or in the

12  Bankruptcy Rules shall have the meaning assigned to that term in

13  (and shall be construed in accordance with the rules of

14  construction under) the Bankruptcy Code or the Bankruptcy Rules.

15  Without limiting the foregoing, the rules of construction set

16  forth in Section 102 of the Bankruptcy Code shall apply hereto.

17  The definitions and rules of construction contained herein do not

18  apply to the Disclosure Statement or to the exhibits to the Plan

19  except to the extent expressly so stated in the Disclosure

20  Statement or in each exhibit to the Plan.

21      j. Except to the extent that federal law, including the

22  Bankruptcy Code or the Bankruptcy Rules are applicable, the

23  rights and obligations arising under the Plan shall be governed

24  by, and construed and enforced for all purposes in accordance

25  with, the laws of the State of California, without giving effect

26  to any principles of conflict of laws thereof.

27

28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1   **k**. All exhibits to the Plan are incorporated into the Plan
2   and will be deemed to be included in the Plan, regardless of when
3   they are filed.

  **6.** **Computing Time Periods**
5     In computing any period of time prescribed or allowed by the
6   Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

  **7.** **Section Numbers**
8     References in the Plan and Disclosure Statement to a Code
9   section are references to the United States Bankruptcy Code
10  (Title 11 of the United States Code) except as otherwise
11  indicated.

  **8.** **Notices and Delivery of Documents**
13    All notices, correspondence, and other deliveries under this
14  Disclosure Statement must be directed as follows:

| | |
|---|---|
| To the Debtor or<br>Reorganized Debtor: | MAMMOTH SAN JUAN CAPISTRANO I LLC<br><br>Attn: Robert Wish<br><br>29222 Rancho Viejo Road<br><br>San Juan Capistrano, California |
| With a Copy to: | Thomas C Corcovelos  Esq.<br><br>CORCOVELOS LAW GROUP<br>(1) 1001 Sixth Street, Suite 150<br>Manhattan Beach, California 90266<br>310-374-0116 |

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

**II.**

**BACKGROUND**

**A. Description and History of the Debtor's Business**

The Debtor, MAMMOTH SAN JUAN CAPISTRANO I LLC, (Mammoth) is a California Limited Liability Company that was formed on May 28, 2004 by Robert Wish to acquire the Mammoth Land and develop the site into two class A multi-tenant office buildings located at 29222 Rancho Viejo Road (Mammoth Property 1) and 29122 Rancho Viejo Road (Mammoth Property 2) San Juan Capistrano, California. There are 33 LLC Members that have invested in the LLC.  The investors are comprised of retirees, doctors, real estate brokers/mortgage industry, real estate management and three Native American tribes.  Some of these shares are held in retirement funds (IRA's, 401Ks).

The Mammoth Land was acquired on June 29, 2004 with construction of the Mammoth Property commencing on September 26, 2005. Mammoth Property 1 was completed on October 11, 2006 and consists of a two-story 83,466 gross sf fully improved office building with 54 individual units.  Mammoth Property 2 was completed on November 29, 2006 and consists of a two-story 44,938 gross sf fully improved office building with 26 individual units. The design and flexibility of the Mammoth Property is unique and is founded upon a model formulated by Robert Wish and fine tuned over a 35 year period of management and development. The Mammoth Property utilizes a multi-tenant courtyard concept, which offers turnkey class-A office suites to small businesses. Surrounding a

34

lavish and lushly landscaped courtyard with water features and tropical landscape, The Mammoth Property offers small businesses preconfigured 1-10+ room office suites.  Suites are independently metered giving tenants individual control of their utilities including HVAC.  The Mammoth Property offers "plug and play" telephone and data allowing tenants to simply move in furniture and begin operations.  Many tenants occupy space the same week the lease is signed.  Larger suites (5-10 rooms) feature additional amenities such as high-end granite reception desks and chrome T-bar ceilings.

Focusing on the needs of tenant, each room within the Mammoth Property has a window and each suite is rough plumbed with water and sewer.  Additionally, the buildings feature high capacity elevators (with emergency battery backup), secured off-hour access, locked restrooms and video monitoring.

The spaces range from 250 to 3,000 square feet with an average suite size of 1,150 square feet.  Suites are move-in ready and finished to be suitable for most small business tenants.  A major contributory factor to the effectiveness of this model is the small tenant niche; 90% of businesses in America are 20 employees or less.  There are only so many ways a small tenant can layout small space.  Over the years, Mammoth Equities has developed proprietary layouts that virtually all general office users with less than 20 employees fit into.  These preconfigured suites have been engineered over the years to maximize efficiency and functionality.

Thirty-five years in the industry have contributed to this

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

proprietary model that Mammoth Equities now employs in ten cities in three states.  The model was specifically designed to minimize Tenant Improvement capital expenditures and maximize profitability.  The buildings function much like an apartment building with shorter leases for "as is" space.  It is not uncommon for stabilized Mammoth buildings to have a waiting list. This model has proven successful over the past several years.

Averaging 2 to 3 year lease terms, the Mammoth Property is geared to a high turnover model.  Small businesses tenants' needs can change drastically in three years.  Accordingly, the short lease term and immediate occupancy provide them critical flexibility with minimal out of pocket expenses (i.e. No TI's) to get up and operational.  Small tenants are less concerned with the "customization" of their spaces due to the shorter lease term.

Each building has 24 hour access with access after 7:00 PM by way of magnetic key that unlocks the front door of each lobby. From a marketing standpoint, the design and flexibility of the Mammoth Property offers great competitive advantage over other new offices in the market area as a potential tenant can designate any number of offices they require and on the same day, obtain occupancy. Other new projects in the market area are not truly competitive as a tenant has to wait weeks or even months to occupy as the offices are in shell condition and must be built out prior to occupancy. Moreover, from a practical standpoint in a recessionary environment where banks and lending institutions are rarely making loans on real estate, an office building that

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

requires no tenant improvement dollars in order for a tenant to sign a lease and occupy space has an overwhelming advantage over other new office buildings that are in a shell condition and that must seek substantial financing in a highly restrictive lending environment to finish out the space for a tenant. The Mammoth Property is therefore unique in that it requires no additional capital for completion of Tenant Improvements or to remodel its space, in order successfully emerge from chapter 11.

The Manager of MAMMOTH SAN JUAN CAPISTRANO I LLC is Mammoth Equities, LLC whose Managing Member is Robert Wish.  Robert Wish has been active in commercial real estate investment and development since 1965 and has been a general partner or manager in several California limited partnerships and limited liability companies. Mr. Wish has constructed numerous projects in addition to acquiring completed projects for the benefit of various entities formed by him. Mr. Wish has purchased approximately fifty existing commercial properties ranging in size from 4,000 to 145,000 square feet and has developed twenty-eight commercial projects ranging in size from 2,400 to 168,000 square feet. These projects include office, strip center retail, mini storage (self-storage) and industrial.  He has also developed over fifteen residential projects ranging in size from a large single family custom home tract to a 496 unit apartment building. Mr. Wish currently controls approximately 1.3 million square feet of commercial real estate in California, Arizona, Nevada and Texas through several operating partnerships some of which are managed by his existing company Foremost Business Parks.

Mr. Wish has over thirty-five years experience in managing multi tenant properties which are occupied by numerous small tenants. Since 2004 Mammoth Equities has leased to more than 1,500 small businesses at properties similar in design to the Mammoth Property.  As outlined above, it is the business philosophy of Mr. Wish to develop each project with built-out office suites, thereby affording tenants several options with which to match their space requirement.  Not only does this result in immediate occupancies and immediate rental streams, but when tenants vacate the property, minimal costs are borne by the landlord to release the space (typically paint and carpet cleaning only).

The Mammoth Property is managed by Mammoth Equities Property Management, Inc. who manages a portfolio of 20 similar buildings at 14 locations with approximately 1.15 million square feet. Over 95% of the space managed by Mammoth Equities Property Management is multi-tenant office space similar to that of the Debtor.   Mammoth Equities Property Management's staff has extensive knowledge about the unique needs and strategies to successfully manage Mammoth model properties.

Currently Mammoth Equities Property Management oversees 400+ small business tenants and has executed over **1,500** leases since 2004.  Mammoth Equities Property Management utilizes significant technological resources to perform management services including fully integrated Accounting and PM Software, all paperless database and filing systems, high speed communications including the Internet and internal networks, fully redundant servers and

1  personal computers and proven property management and property

2  performance applications.

3

4  Mammoth Equities Property Management additionally handles

5  all leasing for the properties and uses Mammoth's proprietary and

6  unique leasing strategy as well as implementing comprehensive

7  marketing and promotion programming.

8

9  **B.    Principals/Affiliates of Debtor's Business**

10  The Debtor, MAMMOTH SAN JUAN CAPISTRANO I LLC is made up of 33

11  Members as listed in section 21 of the schedules.

12  **C.    Management of the Debtor Before and After the Bankruptcy**

13  Management of the Debtor before and after the filing of the

14  Bankruptcy is by Mammoth Equities LLC.

15

16

17  **D.    Events Leading to Chapter 11 Filing**

18  Here is a brief summary of the circumstances that led to the

19  filing of this Chapter 11 case: Robert Wish formed Mammoth San

20  Juan Capistrano I on May 28, 2004 and raised $4,250,000 by

21  selling 100 shares to the 33 equity interest holders for $42,500

22  per share. The $4,250,000 enabled the Debtor to acquire the

23  Mammoth Land and obtain the construction loan to develop the

24  Mammoth Property.

25  After purchasing the Mammoth Land and closing the

26  construction loan, the Debtor constructed Mammoth Property 1 and

27  Mammoth Property 2 completing construction of Mammoth Property 1

28  on October 11, 2006 and Mammoth Property 2 on November 29, 2006.

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1   Leasing commenced on Mammoth Property 1 in October 2006, while

2   leasing commenced on Mammoth Property 2 in February, 2008.

3       As part of its emphasis on being a good neighbor, after

4   purchasing the Mammoth Land, Mammoth Built extensive wrought iron

5   fences along the property line to placate its neighbors concerns

6   during construction. In addition, Mammoth installed sewer

7   connections to multiple neighbors who had been on septic tanks,

8   cleaned up a large standing water area (that was breeding

9   mosquito's) by building a drainage system on the neighbors land

10  for their benefit and donated $500,000 worth of land to the

11  adjacent Church

12

13      On December 13, 2006 the Debtor obtained a loan from

14  Washington Mutual Bank for $15,040,000 encumbering Mammoth

15  Property 1 and $8,460,000 encumbering Mammoth Property 2 to pay

16  off the construction loan and provide an interest reserve to make

17  payments on the new loans while the Mammoth Property underwent

18  its leasing phase.

19      The completion of the construction of the Mammoth Property

20  was approximately one year before the onset of the recession

21  which began in earnest in November, 2007.  Although a project the

22  size of the Mammoth Property typically required an 18 month

23  marketing period to reach 90% occupancy, 12 months into the

24  marketing the recession began and leasing began to slow.  In

25  addition, numerous tenants that were in the residential mortgage

26  business were severely impacted by the downturn in residential

27  real estate and either reduced the space they were occupying or

28  vacated altogether.  In the recessionary economic environment,

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET, SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1   the Debtor continued leasing to new tenants but was unable to

2   meet its occupancy projections due to the loss of existing

3   tenants.

4       In August, 2007, the interest reserve servicing the

5   mortgages on the Mammoth Property was completely drawn down.

6   Beginning in September, 2007, Robert Wish began subsidizing the

7   Mammoth Property mortgage payments by loaning funds to Mammoth

8   Equities who in turn loaned funds to the Debtor to make the

9   mortgage payments on the Mammoth Property.  Between September,

10  2007 and December 1, 2008, Robert Wish, by way of Mammoth

11  Equities loaned over $1,000,000 to the Debtor to make the Mammoth

12  Property mortgage payments.

13      While the Mammoth Property was in its leasing phase and in

14  order to increase the marketability of the Mammoth Property to

15  real estate investors, in May 24, 2010008 the Debtor forwarded

16  the lot line adjustment approved by the city of San Juan

17  Capistrano to Washington Mutual for their approval, which

18  approval would enable Mammoth Property 1 and Mammoth Property 2

19  to be sold separately to different investors. As background, the

20  Original Washington Mutual Bank Loans required Mammoth to process

21  a lot line adjustment:  2 separate loans were recorded in first

22  position against the Mammoth Property and the original lot line

23  ran through Mammoth Property 1 necessitating the Original

24  Washington Mutual Bank Loans be cross collateralized until the

25  lot line adjustment was recorded. As a condition of funding the

26  Original Washington Mutual Bank Loans, Washington  Mutual

27  required Mammoth to process the lot line adjustment and agreed to

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

administratively approve the lot line adjustment once the city of San Juan Capistrano approved the lot line adjustment long as it was in substantial conformance with the ALTA survey referenced in the Original Washington Mutual Loans, which it was. The lot line adjustment was approved by the city of San Juan Capistrano in February, 2008, and the only requirement remaining for the lot line adjustment to be recorded was Washington Mutual Bank's approval.

Although under the terms of the Original Washington Mutual Bank Loans, Washington Mutual was to administratively approve the lot line adjustment because it was in substantial conformance with the ALTA survey referenced in the Original Washington Mutual Loans, they delayed doing so inflicting economic harm on the Debtor by stopping the sale of Mammoth Property 1 to independent investors as well as stopping a refinance of Mammoth Property 1 which would have paid off the loan encumbering Mammoth Property 1 in full. The Debtor assumed Washington Mutual Bank would approve the lot line adjustment in a timely fashion, and contemporaneously with the lot line adjustment being processed and approved by the city of San Juan Capistrano, Mammoth solicited offers for the sale of the Mammoth Property. On April 9, 2008, Mammoth executed a letter of intent from Cathay Bank to refinance Mammoth Property 1 for $16,500,000 an amount well in excess of the loan encumbering Mammoth Property 1. This Cathay Bank loan required the lot line adjustment be recorded. Washington Mutual Bank refused to approve the lot line adjustment so after receiving a $20,000 deposit from Mammoth and completing

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1 | 3 months of due diligence, Cathay Bank withdrew its letter of
2 | intent on July 17, 2008 and returned $14,000 of the deposit
3 | because Mammoth could not deliver clear title with the recorded
4 | lot line adjustment on Mammoth Property 1.  On August 4, 2008,
5 | the Debtor received an offer on Mammoth Property 1 for twenty two
6 | million dollars ($22,000,000).  The offer required a timely close
7 | of escrow due to the time constraints imposed on the Buyer by
8 | their 1031 exchange.  If the Buyer could not close within the
9 | timeframe dictated under the 1031 exchange, the Buyer would incur
10 | a substantial taxable event resulting in the significant loss of
11 | capital.  Although the buyer was prepared to purchase Mammoth
12 | Property 1 and close escrow, and although 6 months had passed
13 | since the debtor had requested Washington Mutual Bank approve the
14 | lot line adjustment to increase the marketability of the Mammoth
15 | Property, Washington Mutual Bank refused to approve the lot line
16 | adjustment even though they were required to approve it and were
17 | aware of the twenty two million dollar ($22,000,000) offer and
18 | the 1031 exchange time constraints.  Because Washington Mutual
19 | Bank refused to approve the lot line adjustment, the Debtor could
20 | not guarantee the escrow could close within the time frame
21 | allotted under the 1031 exchange and the buyer purchased another
22 | property and the sale of Mammoth Property 1 was lost.  After the
23 | loss of the twenty two million dollar ($22,000,000) sale and the
24 | Cathay Bank loan, Mammoth obtained another offer on Mammoth
25 | Property 1 on October 1, 2008 for eighteen million seven hundred
26 | thousand dollars ($18,700,000), which again was predicated upon a
27 | 1031 exchange being timely completed.  Washington Mutual again

failed to approve the lot line adjustment and the sale was lost,
with the Buyer acquiring another property in the time allotted
under its 1031 exchange.

As the recession deepened, Washington Mutual Bank collapsed
in the largest bank failure in U.S. history, specifically, on
September 26, 2008 Washington Mutual Bank was seized by the FDIC
and JP Morgan Chase acquired Washington Mutual Bank the same day.

Beginning in October, 2008 the Debtor began negotiations
with JP Morgan Chase to extend the Mammoth Loans encumbering the
Mammoth Property, both of which were due to fully mature on
January 1, 2009. Due to the deteriorating capital markets,
refinancing the loans encumbering the Mammoth Property was not
feasible. Robert Wish held numerous telephonic meetings with JP
Morgan Chase in an effort to extend the loans encumbering the
Mammoth Property but those efforts were not successful.

On January 1, 2009 the Debtor defaulted on the Mammoth Loans
and although the Debtor sought to continue to make the mortgage
payments on the Mammoth Loans to JP Morgan Chase, JP Morgan Chase
refused to accept the payments unless the Debtor signed a 60 to
90 day loan extension under terms and conditions that among other
things;

(1) Required the Debtor to make an immediate payment to JP
Morgan Chase of $6 million, (2) Required the Debtor to re-cross
collateralize the Mammoth Loans, thereby reducing the
marketability of the Mammoth Property, (3) Required the Debtor to
provide financial and credit authorization forms for Robert Wish,
who is neither a borrower nor a guarantor under the Loans, (4)

44

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  Improperly and menacingly asserted that, despite a signed

2  "Modification Agreement" recorded in October, 2008 modifying the

3  Mammoth loans which un-crossed the Mammoth Loans and created new

4  collateral descriptions for Mammoth Property 1 and Mammoth

5  Property 2, that the Mammoth Loans were still "cross-

6  collateralized,"  (5) Tendered to Debtor an oppressive "Pre-

7  Negotiation Agreement" as a pre-requisite to any work-out

8  discussions, which JP Morgan Chase stated was a "non-negotiable"

9  form, and which contained confusing and deceptive language

10  regarding and suggesting, among other things, that the Mammoth

11  Loans were still "cross-collateralized," and (6)Referred the

12  Debtor to, and actively encouraged the Debtor to pursue a

13  supposed source of financing to pay off the mammoth loans, who

14  turned out to be a personal acquaintance of the primary loan

15  officer administering the Mammoth Loans, working with suspicious

16  "offshore" entities, which proposed exotic and highly

17  questionable financing structures to Debtor.

18      On March 20, 2009 the Debtor filed a lawsuit against JP

19  Morgan Chase, the successor in interest to Washington Mutual

20  Bank,    MAMMOTH  SAN JUAN CAPISTRANO, LLC, ETC, AND MAMMOTH

21  EQUITIES,LLC, ETC, ET AL.  VS  JPMORGAN CHASE BANK, F.A., ETC, ET

22  AL.," Case No. 00120389 that in addition to the improper and

23  damaging actions by JP Morgan Chase referenced in items 1-6 in

24  the paragraph above, sets forth four (4) separate causes of

25  action against Washington Mutual Bank and its purported

26  successor-in-interest under the Original Washington Mutual Bank

27  Loans, JP Morgan Chase, for "Declaratory Relief," "Injunctive

45

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  Relief," "Breach of Contract," and "Breach of Covenant of Good

2  Faith and Fair Dealing," each of which is based on one or more

3  instances of improper conduct by Washington Mutual Bank or JP

4  Morgan Chase ("Lenders") occurring either before or after January

5  1, 2009 stated Maturity Date.  The improper and damaging actions

6  of Lenders alleged in Debtor's Lawsuit include:

7  **Lender's Failure to Timely Approve a Lot Line Adjustment ("LLA")**

8  **and Permit "Un-crossing" of Loans, Thereby Preventing Debtor's**

9  **Ability to Sell or Refinance the Buildings Prior to Maturity.**  At

10  the inception of the Washington Mutual Bank Loans in December

11  2006, the Lot Line separating the North Building Parcel from the

12  South Building Parcel ran under the South Building.  Accordingly,

13  and for this reason alone, each of the Original Washington Mutual

14  Bank Loans contained a "Cross-collateralization" provision which

15  permitted the Lender, in the event of a default under either

16  Loan, to foreclose against both Parcels.  However, because the

17  Cross-Collateralization provision also effectively prevented

18  Debtor from selling refinancing or otherwise disposing of either

19  the Mammoth Property 1 or Mammoth Property 2 without first paying

20  off the Mammoth loans, the Debtor required an "Addendum" be

21  signed by Washington Mutual Bank for the Mammoth Loans, which

22  expressly required the Lender to reasonably and promptly approve

23  an LLA moving the Lot Line to a point between the two buildings,

24  at which time the Mammoth Loans would be "un-crossed," i.e., the

25  Cross-Collateralization provision of the Mammoth Loans would be

26  forever extinguished.  Debtor alleges that Washington Mutual Bank

27  unreasonably and intentionally delayed in approving the LLA and

un-crossing the Mammoth Loans during 2008 for a period of almost eight (8) months, in an attempt to "run the clock out" on Debtor, and retain its superior "cross-collateralized" position for as long as possible, even though such delay directly caused Debtor to lose a fully negotiated sale of Mammoth Property 1, as well as a separate refinance opportunity, either of which would have closed and paid off the JP Morgan Chase Note 1 encumbering Mammoth Property 1 well in advance of Maturity Date.  In accordance with the Agreement for Restructuring Loan #625028951 and Loan #625028961, the above referenced adversary proceeding will be dismissed with prejudice as part of the Agreement for Restructuring Loan #625028951 and Loan #625028961 once documents referenced on the Agreement for Restructuring Loan #625028951 and Loan #625028961 have been fully executed.

**E.    Significant Events During the Bankruptcy**

    **1.Bankruptcy Proceedings**

The following is a chronological list of significant events which have occurred <u>during</u> this case:

On or about July 8 2009, the Debtors' filed its chapter 11 case.

The Court has approved the employment of the following professionals:  None to date: A motion to approve the employment of Thomas C Corcovelos as Counsel for the Debtor will be filed by the Debtor.

In September, 2009 the debtor and JP Morgan Chase agreed to an interim cash collateral stipulation.

On April 30, 2010 Robert L. Wish and Mammoth Equities LLC

executed an Agreement for Restructuring Loan #625028951 and Loan #625028961 with JP Morgan Chase which outlines the terms under which the JP Morgan Chase Note 1 and the JP Morgan Chase Note 2 will be restructured pursuant to the plan.

Currently, the following significant adversary proceeding has been filed. Mammoth Equities LLC vs. JP Morgan Chase Bank NA case # 8:09-ap-01433-RK filed on July 17, 2009.  In accordance with the Agreement for Restructuring Loan #625028951 and Loan #625028961, the above referenced adversary proceeding will be dismissed with prejudice as part of the Agreement for Restructuring Loan #625028951 and Loan #625028961 once documents referenced on the Agreement for Restructuring Loan #625028951 and Loan #625028961 have been fully executed.

## 2.    Other Legal Proceedings

In addition to the proceedings discussed above, the Debtor is currently involved in the following non-Bankruptcy legal proceedings:

A    Notice of Default, On March 26, 2009, commenced its non-judicial foreclosure proceedings against the Mammoth Property by causing Notices of Default to be recorded with respect to the Mammoth Loans.  Debtor contends that each of the Notices of Default was defective on its face and made written demand upon both JP MORGAN CHASE and the foreclosure trustee to cancel the defective Notices of Default.  The basis of Debtor's demand was that each of the Notices contained false and misleading information regarding the real property being foreclosed on under each Notice.  Each of the Notices of Default (i.e., the separate

48

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Notice the for North Building Loan and the separate Notice for the South Building Loan, omitted the separate legal description for the corresponding North Parcel or South Parcel, respectively; instead, each Notice described the real property by an Assessor's Tax Parcel Number ("APN: 650-011-32"), which includes both the North Parcel and the South Parcel. Thus, each Notice of Default purported to initiate a foreclosure for each Loan against both Parcels, which created confusion and which meant, among other things, that it would not be possible to prevent foreclosure under either of the Notices by paying off only one of the Loans. JP MORGAN CHASE and the foreclosure trustee rejected Debtor's demands to cancel and re-issue the Notices of Defaults, but failed to clarify or assure Debtor that it was not seeking to foreclose against both Parcels for each Loan (i.e., that it was not seeking to still treat the Loans as "cross-collateralized"). However, Debtor contends that JP MORGAN CHASE and the foreclose trustee admitted that the Notices of Default were defective in that, among other things, the Notices of Sale recorded for each of the Loans on or about July 3, 2009, did not repeat the same mistake and defect as in the Notices of Default, and were careful to use the separate legal description for each Parcel as opposed to the common and misleading APN.  Debtor contends that the Notices of Sale could not, as a matter of law, retroactively cure the defective Notices of Default.

3.    **Actual and Projected Recovery of Preferential or Fraudulent Transfers**

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

<u>Nothing</u> is estimated to be realized from the recovery of fraudulent and preferential transfers.  The following is a summary of the fraudulent conveyance and preference actions filed or to be filed in this case:  <u>The Debtor does not expect, at this time, to file any fraudulent conveyance or preference actions in this case.</u>

**4. Procedures Implemented to Resolve Financial Problems**

The Debtor has implemented the following procedures as part of its strategy to successfully lease the Mammoth Property:  The Debtor has increased its advertising budget, initiated an incentive program offering free telephone service in exchange for tenants signing a long term lease, and has increased its outreach to the real estate brokerage community both in terms of leasing office space and to sell Mammoth Property 1 or Mammoth Property 2.  To that end, as of the writing of this Disclosure Statement, the Debtor is negotiating a sale of Mammoth Property 2 to an investment group that would net the estate $9,800,000 before typical closing costs.

**5. Current and Historical Financial Conditions**

The Debtor's debt service obligations were historically paid through the interest reserve in the construction loan, the interest reserve in the original Washington Mutual Bank Loans and through capital infusions from Mammoth Equities. The Debtor's current operations are able to meet its debt service obligations on Mammoth Property 1 but unable to meet its debt service obligations on Mammoth Property 2.  Although currently unable to meet its debt service obligations on Mammoth Property 2, the

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  Debtor estimates as of the writing of this disclosure Statement

2  that it can meet 90% of its debt service obligations on Mammoth

3  Property 2 and that by the Effective Date, the Debt service

4  obligations for Mammoth Property 2 will be met either through

5  rental income on Mammoth Property 2 or by Mammoth Property 1

6  subsidizing the payment for Mammoth Property 2.

7     The identity and fair market value of the estate's assets are

8  listed in Exhibit A as well as copies of pertinent pages of JP

9  Morgan's January, 2009 appraisals of Mammoth Property 1 and

10  mammoth Property 2.

**III.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**A. What Creditors and Interest Holders Will Receive Under The**
**Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies

claims and interests in various classes according to their right

to priority.  The Plan states whether each class of claims or

interests is impaired or unimpaired.  The Plan provides the

treatment each class will receive.

**B.    Unclassified Claims**

Certain types of claims are not placed into voting classes;

instead they are unclassified.  They are not considered impaired

and they do not vote on the Plan because they are automatically

entitled to specific treatment provided for them in the

Bankruptcy Code.  As such, the Proponent has <u>not</u> placed the

following claims in a class.

51

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1.    **Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(1).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the Debtor's § 507(a)(1) administrative claims and their treatment under the Plan.

| Name | Amount Owed | Treatment |
|---|---|---|
| Thomas C Corcovelos | $1,000 | Paid on Effective Date |
|  |  |  |
|  |  |  |
|  |  |  |
| Clerk's Office Fees | $200 (estimated) | Paid in full on Effective Date |
| Office of the U.S. Trustee Fees | $500 (4th 1/4 ' 96) | Paid in full on Effective Date |
|  | TOTAL $700.00 |  |

<u>Court Approval of Fees Required:</u>

The Court must rule on all fees listed in this chart before the fees will be owed.  For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

As indicated above, the Debtor will need to pay $700.00 worth of administrative claims on the Effective Date of the Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the claim.  As indicated elsewhere in this Disclosure Statement, Debtor will have $1,000,000 in cash on hand on the Effective Date of the Plan.  The source of this cash will be lease revenue and the New Value contribution.

### 2.    Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  Except to the extent that the holder of a particular Allowed Priority Tax Claim agrees to a different treatment thereof, the Code requires that each holder of an Allowed Priority Tax Claim receive the present value of such Allowed Priority Tax Claim in deferred Cash payments over a period not exceeding six years from the date of assessment of such tax.

Treatment of Allowed Priority Tax Claims.  The Debtor's Plan provides that deferred Cash payments will be paid in equal annual installments of principal and interest and will be in an amount sufficient to amortize each Allowed Priority Tax Claim fully over a period of six years from the Effective Date.  The outstanding and principal amount of each Allowed Priority Tax Claim will bear interest, commencing on the Effective Date and continuing until such Allowed Priority Tax Claim is paid in full, at the lesser of: (i) the rate of six percent (6%) per annum; or (ii) the rate specified by Section 6621(a) of the Internal Revenue Code, as such rate is adjusted from time to time.  Payments to holders of

Allowed Priority Tax Claims will commence on the first anniversary of the Effective Date and will continue on each annual anniversary of the Effective Date.

The Reorganized Debtor will have the right to pay all Allowed Priority Tax Claims, or any remaining balance of such Claim, in full, at any time on or after the Effective Date, without premium or penalty. The following chart lists all of Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan: **The Debtor has no Section 507(a)(8) priority tax claims.** [1]

The following chart lists <u>all</u> of the Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan:

| <u>Description</u> | <u>Amount Owed</u> | <u>Treatment</u> |
|---|---|---|
|  |  |  |
| · Name = Not Applicable<br><br>· Type of tax = None<br><br>· Date tax assessed = Not Applicable | 0.00 | · Pymt interval        =<br>· Est. pymt amt/interval =<br>· Begin date           =<br>· End date             =<br>· Interest rate %       =<br>· Total payout amount%   = $ |

C.    **Classified Claims and Interests**

      **1.    Classes of Secured Claims**

      Secured claims are claims secured by liens on property of

---

[1]    In the event any taxing agencies filed Priority Tax Claims, the Debtor reserves the right to file an objection to such Claims on any appropriate grounds.

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

the estate.   The following chart lists all classes containing

Debtor's secured pre-petition claims and their treatment under

the Plan.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Secured claim of:<br><br>· Name = Orange County Tax Assessor<br><br>· Collateral description = Property Tax Lien<br><br><br>· Priority of security int. = 1st<br><br>· Principal owed = $113,893<br><br>· Post-pet. arrearage amount = $26,987 (est)<br><br>· Total claim amount = $140,880 | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Pymt interval= Monthly<br>· Est. pymt amt/interval = $3,818<br>· Balloon pymt = 0<br>· Begin date = 8/30/2010<br>· End date = 2/28/2014<br>· Interest rate % = 6.0%<br>· Total payout % = 100<br>$140,880 will be paid over 42 months at $2,787 per month on 100% of a principal balance of $140.880 unless the Mammoth Property 1 or mammoth Property 2 is sold at which time the Class 1 Claimant will be paid in full at close of escrow. Treatment of lien =  Lien is retained and in full force and effect. |
|  |  |  |  |  |

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Comments:  Class 1 consists of any and all secured claims for real property taxes and income taxes pertaining to the property. Class 1 is impaired under the Debtor's Plan.  The Debtor proposes to satisfy the Allowed Secured Claim of the Class 1 Claimant by paying the Class 1 Claimant deferred cash payments equal to the value of its Allowed Secured Claim as of the Effective Date. Commencing on the tenth (10th) day of the first full month after the Effective Date, such deferred cash payments will be made in equal monthly installments of principal and interest in an amount sufficient to amortize the Allowed Secured Claim over a period of three and one half (3.5) years, all due in three and one half (3.5) years from the Effective Date.  The outstanding and unpaid amount of the Allowed Secured Claim will bear interest, commencing on the Effective Date and continuing until such Allowed Secured Claim is paid in full, at the rate of 6.0% per annum.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|--------|-------------|----------------|----------------|-----------|

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| 2 | Secured claim of: | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Pymt interval = Monthly |
|---|---|---|---|---|

| | · Name =JP Morgan Chase | | | · Est. pymt amt/interval = $68,944 1st 6 month period |
|---|---|---|---|---|
| | · Collateral description = 1st Trust Deed | | | $75,838 2nd six month period, |
| | · Priority of security int. = 1st | | | $82,733 3rd 6 month period, |
| | · Principal owed = $16,546,450 | | | $89,627 4th 6 month period, fixing at $96,521 in month 25 through month 42. |
| | · Pre-pet. arrearage | | | · Balloon pymt = $16,546,450 |
| | · Post-pet. arrearage amount = Included | | | · Begin date = 8/30/2010 |
| | · Total claim amount = $16,546,450 | | | · End date = 2/28/2014 |
| | | | | · Interest rate % = 5% interest only increasing by 0.5% each successive 6 month period after the initial payment and fixing at 7% interest only. |
| | | | | · Total payout % = 100% |
| | | | | $20,186,669 will be paid over 42 months on 100% of a principal balance of $16,546,450. |
| | | | | · Treatment of lien = Lien is retained and in full force and effect. |

Comments:

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1          Class 2 consists of the Allowed Claims of JP

2    MORGAN CHASE or the holder of the JP Morgan Chase Note 1.  Class

3    2 is impaired under the Plan.  As of the confirmation date, the

4    JP Morgan Chase Note 1 shall be restructured in accordance with

5    the Agreement for Restructuring, dated April 30, 2010 and

6    attached hereto as Exhibit H and incorporated herein by

7    reference.

8          Payments on the Restructured JP Morgan Chase

9    Note 1 shall be made in monthly installments of interest of 5%

10   interest only increasing by one half percent (0.5%) each

11   successive 6 month period following the initial payment until the

12   interest rate reaches seven percent (7%) at which time the

13   interest rate shall fix at seven percent (7%). (This compares to

14   the JP Morgan Chase Note 1, which had interest calculated with

15   reference to a variable annual rate of interest of two and two

16   tenths percent (2.20%) over the 1 year Constant Maturity Treasury

17   Rate (CMT) which as of January 26, 2009 equaled 2.57%) meaning

18   the Debtor's initial proposed interest rate is nearly twice the

19   contract interest rate of the JP Morgan Chase Note 1 and nearly

20   2.75 times the contract interest rate when it reaches seven

21   percent (7%).) Interest shall begin to accrue on the Restructured

22   JP Morgan Chase Note 1 as of the Effective Date.  The first (1st)

23   payment shall be due on the fifteenth (15th) day of the first

24   (1st) full month following the Effective Date, and shall be in an

25   amount equal to a percentage of a full monthly installment

26   payment derived from the number of days remaining in the month in

27   which the Effective Date occurs (the numerator) divided by the

28

1  number of days in the month in which the Effective Date occurs

2  (the denominator).  Thereafter, payments shall be due on the

3  fifteenth (15th) day of each and every month until the forty

4  second (42nd) month after the Effective Date at which time the

5  entire outstanding balance of the Restructured JP Morgan Chase

6  Note 1 shall be all due and payable.  Upon payment in full of the

7  Restructured JP Morgan Chase Note 1, the lien evidenced by the

8  Amended JP MORGAN CHASE Note 1 Security Documents shall be deemed

9  satisfied and shall be deemed canceled.


11     In the event that the Reorganized Debtor defaults in its

12  obligation to pay each payment due and payable under the

13  Restructured JP Morgan Chase Note 1 and the Amended JP MORGAN

14  CHASE Note 1 Security Documents , the holder of the Restructured

15  JP Morgan Chase Note 1 shall be entitled to record a notice of

16  default and accelerate the entire unpaid indebtedness and/or

17  exercise such other remedies as provided under the guarantee, the

18  Restructured JP Morgan Chase Note 1 and the Amended JP MORGAN

19  CHASE Note 1 Security Documents or under applicable California

20  law.  The Reorganized Debtor shall be entitled to cure and

21  reinstate any such default under applicable California law.

22     Nothing in the Plan shall enhance or otherwise increase the

23  rights of the holder of the Class 2 claim to seek recovery on its

24  claim as against any party other than the Reorganized Debtor.

25

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| 3 | Secured claim of: | N | Impaired, | · Pymt interval = Monthly |
|---|---|---|---|---|
| | · Name =JP Morgan Chase | | Claims in | · Est. pymt amt/interval = |
| | · Collateral | | this class | $34,614 1st 6 month period |
| | description = 1st | | are entitled | $38,075 2nd six month period, |
| | Trust Deed | | to vote on | $41,536 3rd 6 month period, |
| | · Priority of | | the Plan. | $44,998 4th 6 month period, |
| | security int. = 1st | | | fixing at $48,59 in month 25 |
| | · Principal owed = | | | through month 42. |
| | $9,307,255 | | | · Balloon pymt = $8,307,255 |
| | · Post-pet. arrearage | | | · Begin date = 8/30/2010 |
| | amount = included | | | · End date = 2/28/2014 |
| | · Total claim amount = | | | · Interest rate % = 5% |
| | $9,307,255 reduced by | | | interest only increasing by |
| | $1,000,000 new value | | | 0.5% each successive 6 month |
| | contribution to | | | period after the initial |
| | $8,307,255 on the | | | payment and fixing at 7% |
| | Effective Date or the | | | interest only in month 25. |
| | amount agreed to between | | | · Total payout % = 100% |
| | JP Morgan Chase and | | | $10,134,851 will be paid over |
| | Debtor. | | | 42 months on 100% of a |
| | | | | principal balance of |
| | | | | $8,307,255. |
| | | | | · Treatment of lien = Lien is |
| | | | | retained and in full force and |
| | | | | effect. |

Comments:

Class 3 consists of the Allowed Claim of JP MORGAN CHASE or the holder of the JP Morgan Chase Note 2.  Class 3 is impaired under the Plan.  As of the confirmation date, the JP Morgan Chase Note 2 shall be restructured in accordance with the Agreement for Restructuring, dated April 30, 2010 and attached hereto as Exhibit H and incorporated herein by reference.

Payments on the Restructured JP Morgan Chase Note 2 shall be made in monthly installments of interest of 5% interest only increasing by one half percent (0.5%) each successive 6 month period following the initial payment until the interest rate reaches seven percent (7%) at which time the interest rate shall fix at seven percent (7%) interest only. (This compares to the JP Morgan Chase Note 2, which had interest calculated with reference to a variable annual rate of interest of two and two tenths percent (2.20%) over the 1 year Constant Maturity Treasury Rate (CMT) which as of January 26, 2009 equaled 2.57%) meaning the Debtor's initial proposed interest rate is nearly twice the contract interest rate of the JP Morgan Chase Note 1 and nearly 2.75 times the contract interest rate when it reaches seven percent (7%).) The first (1st) payment shall be due on the fifteenth (15th) day of the first (1st) full month following the Effective Date, and shall be in an amount equal to a percentage of a full monthly installment payment derived from the number of days remaining in the month in which the Effective Date occurs (the numerator) divided by the number of days in the month in which the Effective Date occurs (the denominator).

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Thereafter, payments shall be due on the fifteenth (15th) day of each and every month until the forty second (42nd) month after the Effective Date at which time the entire outstanding balance of the Restructured JP Morgan Chase Note 2 shall be all due and payable.  Upon payment in full of the JP MORGAN CHASE Second Note 2, the lien evidenced by the Amended JP MORGAN CHASE Note 2 Security Documents shall be deemed satisfied and shall be deemed canceled.

In the event that the Reorganized Debtor defaults in its obligation to pay each payment due and payable under the Restructured JP Morgan Chase Note 2 and the Amended JP MORGAN CHASE Note 2 Security Documents , the holder of the Restructured JP Morgan Chase Note 2 shall be entitled to record a notice of default and accelerate the entire unpaid indebtedness and/or exercise such other remedies as provided under the Guarantees, the Restructured JP Morgan Chase Note 2 and the Amended JP MORGAN CHASE Note 2 Security Documents or under applicable California law.  The Reorganized Debtor shall be entitled to cure and reinstate any such default under applicable California law.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 3 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

**2. Classes of Priority Unsecured Claims**

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be

1  placed in classes.   These types of claims are entitled to

2  priority treatment as follows: the Code requires that each holder

3  of such a Claim receive cash on the Effective Date equal to the

4  allowed amount of such Claim.   However, a Class of unsecured

5  priority claim holders may vote to accept deferred cash payments

6  of a value, as of the Effective Date, equal to the allowed amount

7  of such Claim. **The Debtor has no Claims of the type identified in**

8  **Code Sections 507(a)(3), (4), (5), (6), and (7).**

9      **3. Classes of General Unsecured Claims**

10     General unsecured claims are unsecured claims not entitled

11  to priority under Code Section 507(a).

12     The following chart identifies the Plan's treatment of the

13  classes containing all of Debtor's General Unsecured Claims:[1]

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

---

[1]    The Debtor reserves its right to object to any of the Claims filed by
the following Creditors on any reasonable grounds.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 4 | General unsecured claims of non-insiders · Total amt of claims = $30,000 | y Impaired claims in this class are entitled to vote on the plan | Pymt interval = Monthly· Est. pymt amt/interval = $75 · Balloon pymt = $30,000· Begin date = 8/30/2010· End date = 2/28/2014 · Interest rate % = 3% interest only · Total payout = $33,150 The Class 4 Claimants claims will be paid over 42 months  on 100% of a principal balance of $30,000 for Class 4 Claimants may elect to receive  50% of their claim 12 months after the Effective Date as payment in full. · Treatment of lien = Lien is converted to a promissory note. |

     Class 4 consists of the Allowed Claims of the Non-Insider
General Unsecured Creditors.   Class 4 is impaired under the
Plan. In full and complete satisfaction of the Class 4 Claim, the
Class 4 Claimant shall be treated as follows: On or before the
Effective Date, the Debtor shall execute a promissory note(the
Class 4 promissory Note) with each holder of a Class 4 Claim.
Payments on the Class 4 Promissory Note shall be made in monthly
installments of interest of 3% interest only  The first (1st)
payment shall be due on the fifteenth (15th) day of the first
(1st) full month following the Effective Date, and shall be in an

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1   amount equal to a percentage of a full monthly installment

2   payment derived from the number of days remaining in the month in

3   which the Effective Date occurs (the numerator) divided by the

4   number of days in the month in which the Effective Date occurs

5   (the denominator).  Thereafter, payments shall be due on the

6   fifteenth (15th) day of each and every month until the forty

7   second (42nd) month after the Effective Date at which time the

8   entire outstanding balance of the Class 4 Promissory Note shall

9   be all due and payable, excepting that the Class 4 Claimants may

10  elect to receive a one time lump sum payment equal to fifty

11  percent (50%) of their allowed claim as payment in full on the

12  12th month following the Effective Date. In the event of a sale or

13  refinance of either Mammoth Property 1 or Mammoth Property 2, The

14  Class 4 claimants shall receive a pro-rata payment equal to the

15  percentage paid to JP Morgan Chase calculated by taking the

16  amount of the Class of Claim that is paid to JP Morgan and

17  dividing it by the sum of the Class 2 and Class 3 claims at the

18  time of sale. Hence, if Mammoth Property 1 is sold or refinanced

19  first, and JP Morgan Chase is owed $16,546450 in Class 2 and

20  $9,307,255 in Class 3, the Class 4 Claimants shall be paid the

21  percentage of their claim by calculating 16,546,450 divided by

22  24,853,705 equaling 64% of their claim which shall be paid at

23  close of escrow.  Conversely, if Mammoth Property 2 is sold or

24  refinanced first, the Class 4 Claimants shall be paid the

25  percentage of their claim by calculating 8,307,255 divided by

26  24,853,705 equaling 36% of their claim which shall be paid at

27  close of escrow.  In the event funds are not sufficient to pay

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  the percent owing to the Class 4 Claimants under the

2  aforementioned formula, upon sale of either Mammoth Property 1 or

3  Mammoth Property 2, the Class 4 Claimants shall receive a pro-

4  rata share of the funds available by dividing the total amount of

5  money each Class 4 Claimant is owed by the sum of the Class 4

6  Claimants claim and multiplying that percentage by the amount of

7  money available to pay the Class 4 Claimants after sale of

8  Mammoth Property 1 or Mammoth Property 2.    After any sale of

9  either Mammoth Property 1 or Mammoth Property 2, if the Remaining

10  Property is sold the balance owing to the Class 4 Claimants shall

11  be paid in full after full payment to JP Morgan Chase.

12      Nothing in the Plan shall enhance or otherwise increase the

13  rights of the holder of the Class 4 claim to seek recovery on its

14  claim as against any party other than the Reorganized Debtor.

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1  //

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 5 | General unsecured claims of insiders<br><br>· Total amt of claims = $2,345,196 | Y<br><br>Impaired insider claims in this class are NOT entitled to vote on the plan | Pymt interval = interest accrues monthly Monthly·<br><br>· Balloon pymt = $2,591,442<br><br>Begin date = 8/30/2010·<br><br>End date = 2/28/2014<br><br>· Interest rate % = 3% interest only accruing<br><br>· Total payout = $2,591,442<br><br>The Class 5 Claimants claims will be paid over 42 months on 100% of a principal balance of $2,345,196<br><br>· Treatment of lien = Lien is converted to a promissory note.<br><br>All class 5 Claimants Interest payments shall accrue until the Class 1,2,3 and 4 Claimants Claims are paid in full and no principal payments shall be made to the Class 5 Claimants until the Class 1,2,3, and 4 Claimants claims are paid in full |

Class 5 consists of the Allowed Claims of the Insider General Unsecured Creditors.  Class 5 is impaired under the Plan. In full and complete satisfaction of the Class 5 Claim, the Class 5 Claimant shall be treated as follows: On or before the Effective Date, the Debtor shall execute a promissory note(the

Class 5 Promissory Note) with each holder of a Class 5 Claim. Payments on the Class 5 Promissory Note shall be calculated as monthly installments of interest of 3% interest- only excepting that all payments due shall accrue until the Class 1,2,3,and 4 Claimants are paid in full and no principal payments shall be made to the Class 5 Claimants until the Class 1, 2,3 and 4 Claimants claims are paid in full.  The first (1st) payment shall begin to accrue on the fifteenth (15th) day of the first (1st) full month following the Effective Date, and shall be in an amount equal to a percentage of a full monthly installment payment derived from the number of days remaining in the month in which the Effective Date occurs (the numerator) divided by the number of days in the month in which the Effective Date occurs (the denominator).  Thereafter, payments shall accrue (or once the Class 1,2,3, and 4 Claimants claims have been paid in full payments shall begin) commencing on the fifteenth (15th) day of each and every month until the forty second (42nd) month after the Effective Date at which time the entire outstanding balance of the Class 5 Promissory Note shall be all due and payable after full payment of the Class 1,2,3, and 4 Claimants claims.  Upon sale of Mammoth Property 1 and Mammoth Property 2 the Class 5 Claimant shall be paid in full after full payment of Class 1,2,3 and 4. Upon refinance of Mammoth Property 1 and Mammoth Property 2 the Class 5 Claimant shall be paid proceeds remaining up to the amount ot its claim after full payment of Class 1,2,3 and 4.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 5 claim to seek recovery on its

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

claim as against any party other than the Reorganized Debtor.

### 4. Classes of Interest Holders

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the debtor. If the debtor is a corporation, entities holding preferred or common stock in the debtor are the interest holders. If the debtor is a partnership, the interest holders include both general and limited partners. If the debtor is an individual, the debtor is the interest holder. The following chart identifies the Plan's treatment of the class of interest holders.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 6 | Interest holders<br><br>There are 34 interest holders whose names and percentage interest are listed in Exhibit F | Insider; claims in this class are not entitled to vote on the Plan | Class 6 is unimpaired under the Plan and will receive the pro-rata share of monies available after payment in full to classes 1,2,3,4 and 5 based upon each Class 6 Claimants percentage interest in the Reorganized Debtor, which shall be the same as their percentage interest in the Debtor. |

**Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of any Disputed Claim or**

**Disputed Interest until such Claim or Interest becomes an Allowed**

**Claim or Allowed Interest, and then only to the extent it becomes**

**an Allowed Claim or Allowed Interest.  Any Proof of Claim or**

**Proof of Interest filed which differs from the Scheduled amount**

**is deemed to be a Disputed Claim or Disputed Interest.**

**9.**    **Resolution of the State Court Actions**

The Debtor has transferred its state court action "Mammoth Equities LLC vs. JP Morgan Chase Bank NA" case # 00120389 to the bankruptcy court as an adversary proceeding on July 17, 2009 whose bankruptcy court case # is 8:09-ap-01433-RK. The adversary proceeding will be dismissed with prejudice as part of the Agreement for Restructuring Loan #625028951 and Loan #625028961 once documents referenced on the Agreement for Restructuring Loan #625028951 and Loan #625028961 have been fully executed.

**D.    Means of Effectuating the Plan**

**1.    Funding for the Plan**

The Plan will be funded by the following:  The Reorganized Debtor shall make all payments due under the Plan out of the New Value contribution(s), funds on hand in the Debtor's Estate as of the Effective Date, through the Net Operating Income generated by the lease revenue and or the eventual sale or refinance of the Mammoth Property.  The Debtor believes that Mammoth Property 1 and Mammoth Property 2 will generate lease revenue that in addition to the New Value contribution(s)is sufficient to make the monthly payments required under the plan.

**2.    Post-Confirmation Management**

Mammoth Equities Property Management Group who is the

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

current property manager will be retained as post-confirmation

management.  Its duties will include supervision of the on-site

manager, contracting with contractors and repairmen for

maintenance and repairs, prosecuting unlawful detainer actions

and attempting to collect rents from those tenants who do not pay

the on-site manager, paying bills, and maintaining books and

records for the property.

**3.    Disbursing Agent**

The Debtor shall act as the Disbursing Agent for the purpose

of making all distributions provided for under the Plan.  The

Disbursing Agent shall serve <u>without</u> bond and shall receive

compensation equal to 1% of the gross sales price of the Mammoth

Property for distribution services rendered and expenses incurred

pursuant to the Plan.

**E.    Risk Factors**

The proposed Plan has the following risks  which could

adversely impact the Debtor's ability to make Plan payments: (1)

there is a possibility of default, i.e., possibility of inability

to pay Plan payments, (2) the financial projections provided by

the Plan Proponent may not be realized, (3) the business

environment and rental market may decline from its present level,

(4) competition with the Debtor in the rental market may

increase, (5) the legal environment in terms of laws and

regulations could change and have a negative impact upon the

Debtor, (6) the reorganized Debtor could be sued and the costs

and expenses of litigation could impact the Debtor's financial

circumstances.

**F.    Other Provisions of the Plan**

　　**1.Executory Contracts and Unexpired Leases**

　　　　**a.    Assumptions**

The following are the unexpired leases and executor contracts to be assumed as obligations of the reorganized Debtor under this Plan (see Exhibit C for more detailed information on unexpired leases to be assumed and Exhibit D for more detailed information on executory contracts to be assumed):

The Reorganized Debtor shall assume the commercial leases of space at 29122 and 29222 Rancho Viejo Road, San Juan Capistrano, CA., in accordance with the provisions as set forth in the existing leases.

The Reorganized Debtor shall assume the "Mammoth Equities Property Management Group" property management contract in accordance with the provisions as set forth in the existing contract.

On the Effective Date, the unexpired leases referenced above and the executory contract referenced above shall be assumed as obligations of the reorganized Debtor.  The Order of the Court confirming the Plan shall constitute an Order approving the assumption of the lease and executor contract listed above.  If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Plan.  See Section {I.B.3.} of this document for the specific date.

### b.    Rejections

On the Effective Date, the following executory contracts and unexpired leases will be rejected:  <u>None</u>

The Order Confirming the Plan shall constitute an Order approving the rejection of the lease or contract.  If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  See Section {I.B.3.} of this document for the specific date.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS <u>- not applicable</u>.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

### 2. Changes in Rates Subject To Regulatory Commission Approval

This Debtor <u>is not</u> subject to governmental regulatory commission approval of its rates.

### 3.    Retention of Jurisdiction

The Court will retain jurisdiction to the extent provided by law.

### G.    Tax Consequences of Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN

ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability:

The Debtor does not believe that confirmation or consummation of the Debtor's Plan will have any tax consequences to the Debtor.

Creditors and interest holders are advised to consult with their own tax advisors respecting the tax consequences, if any, of the Plan, including state and local tax consequences.

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be

proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

**A.    Who May Vote or Object**

    **1.Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

    **2.Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

       **a.    What Is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE IS

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult Exhibits F through L to see how the Proponent has characterized your claim or interest.

### b.    What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Proponent believes that classes <u>1, 2, 3 and 4, are non-insider classes that</u> are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  The Proponent believes that there are <u>no classes that</u> are unimpaired. Holders of claims in unimpaired classes do not have the right to vote to accept or reject the Plan.  Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

**3.   Who Is <u>Not</u> Entitled to Vote**

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**4.   Who Can Vote in More Than One Class**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

**5.   Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless

1   the Plan is eligible to be confirmed by "cramdown" on non-

2   accepting classes, as discussed later in Section {IV.A.8.}.

3       **6.      Votes Necessary for a Class to Accept the Plan**

4       A class of claims is considered to have accepted the Plan

5   when more than one-half (1/2) in number and at least two-thirds

6   (2/3) in dollar amount of the claims which actually voted, voted

7   in favor of the Plan.  A class of interests is considered to have

8   "accepted" the Plan when at least two-thirds (2/3) in amount of

9   the interest-holders of such class which actually voted, voted to

10  accept the Plan.

11      **7.      Treatment of Nonaccepting Classes**

12      As noted above, even if <u>all</u> impaired classes do not accept

13  the proposed Plan, the Court may nonetheless confirm the Plan if

14  the nonaccepting classes are treated in the manner required by

15  the Code.  The process by which nonaccepting classes are forced

16  to be bound by the terms of a Plan is commonly referred to as

17  "cramdown."  The Code allows the Plan to be "crammed down" on

18  nonaccepting classes of claims or interests if it meets all

19  consensual requirements except the voting requirements of

20  1129(a)(8) and if the Plan does not "discriminate unfairly" and

21  is "fair and equitable" toward each impaired class that has not

22  voted to accept the Plan as referred to in 11 U.S.C. § 1129(b)

23  and applicable case law.

24

25  **8.    Request for Confirmation Despite Nonacceptance by Impaired**

26          **Class(es)**

27      The party proposing this Plan <u>will</u> ask <u>the Court</u> to confirm

28  this Plan by cramdown on impaired classes <u>1, 2, and 3,</u> if any of

78

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET, SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1   these classes do not vote to accept the Plan.

2   **B.    Liquidation Analysis**

3   Another confirmation requirement is the "Best Interest

4   Test", which requires a liquidation analysis.  Under the Best

5   Interest Test, if a claimant or interest holder is in an impaired

6   class and that claimant or interest holder does not vote to

7   accept the Plan, then that claimant or interest holder must

8   receive or retain under the Plan property of a value not less

9   than the amount that such holder would receive or retain if the

10  Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

11  In a Chapter 7 case, the Debtor's assets are usually sold by

12  a Chapter 7 trustee.  Secured creditors are paid first from the

13  sales proceeds of properties on which the secured creditor has a

14  lien.  Administrative claims are paid next.  Next, unsecured

15  creditors are paid from any remaining sales proceeds, according

16  to their rights to priority.  Unsecured creditors with the same

17  priority share in proportion to the amount of their allowed claim

18  in relationship to the amount of total allowed unsecured claims.

19  Finally, interest holders receive the balance that remains after

20  all creditors are paid, if any. For the Court to be able to

21  confirm this Plan, the Court must find that all creditors and

22  interest holders who do not accept the Plan will receive at least

23  as much under the Plan as such holders would receive under

24  Chapter 7 liquidation.  The Plan Proponent maintains that this

25  requirement is met here for the following reasons:  The Debtor's

26  primary asset is the Mammoth Property, along with the Mammoth

27  Adversary Action against JP Morgan Chase.  The Mammoth Property

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

is encumbered by a first-priority lien in favor of JP Morgan

Chase, the holder of the JP Morgan Chase Note 1 and the JP Morgan

Chase Note 2.  The balance of the JP Morgan Chase Note 1 as of

January 5, 2010 was approximately $16,546,450 and the balance of

the JP Morgan Chase Note 2 as of the January 5, 2010 was

approximately $9,307,255. Based upon the Debtor's estimate, the

liquidated value of Mammoth Property 1 is $12,000,000 and the

liquidation value of Mammoth Property 2 is $6,750,000. Assuming

that in a Chapter 7 proceeding, the liquidation value could be

obtained, and further assuming that there would be normal costs

of sale and other costs of administration attendant to the

Chapter 7 proceeding, there would not be sufficient proceeds

generated by a sale of the Property to even pay the JP Morgan

Chase Note 1 or the JP Morgan Chase Note 2 in full.  The

conclusion that necessarily follows is that Unsecured Creditors

of the Debtor's Estate would not receive any distribution were

this Chapter 11 proceeding converted to one under Chapter 7 of

the Code.  The plan, which provides for a distribution to

Unsecured Creditors, clearly provides a greater return to

Unsecured Creditors than that which would be achieved in a

Chapter 7.  Consequently, the Debtor believe that the Plan, as

proposed, provides to Unsecured Creditors more than they would

receive were the Debtor's Case converted to one under chapter 7

of the Code. The Plan proposes to pay general unsecured creditors

approximately 100% of their total claims while a liquidation of

the Debtor's estate would result in a 0% dividend.  In a Chapter

7 case, a trustee is appointed and entitled to compensation from

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  the Bankruptcy estate in an amount not to exceed 25% on the first

2  $5,000 of moneys disbursed, 10% on any amount over $5,000 but

3  less than $50,000, 5% on any amount over $50,000 but not in

4  excess of $1 million and 3% on all amounts over $1 million.  In

5  this case, the trustee's compensation is estimated to equal

6  $597,000 based upon a liquidated value of the Mammoth Property 1

7  of $12,000,000 and Mammoth Property 2 of $6,750,000 which is

8  equal to approximately 70% to 75% of the fair market value of the

9  Mammoth Property.  Through the Plan however, no trustee's

10 compensation will be incurred.

11     Below is a demonstration, in balance sheet format, that all

12 creditors and interest holders will receive at least as much

13 under the Plan as such creditor or interest holder would receive

14 under Chapter 7 liquidation. (See Exhibit A for a detailed

15 explanation of how the following assets are valued.  This

16 information is provided by the Debtor.)  For purposes of the

17 liquidation analysis, the adversary proceeding in re: Mammoth

18 Equities LLC vs. JP Morgan Chase Bank NA case # 8:09-ap-01433-RK

19 has been given a zero value as it is unlikely a chapter 11

20 trustee would fund the litigation.

21

22 **ASSETS VALUED AT LIQUIDATION VALUES**

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Cash on hand | $0 | |

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Mammoth Property | $18,750,000 | |
| Adversary Proceeding | 0 | |
| Recovery From Avoidance Actions | $.00 | The Debtor does not anticipate that there will be any Avoidance Actions filed. |
| **Total Assets At Liquidation Value** | $18,750,000 | |
| **LESS LIABILITIES IN CHAPTER 7 CASE** | | |
| Less: Secured Creditor Recovery 1[1] | $25,989,585 | |
| Less: Chapter 7 trustee's fees and expenses | $597,000 | |

---

5

| JP Morgan Chase Note 1 on Effective date | $16,546,450 |
|---|---|
| JP Morgan Chase Note 2 on Effective date | $9,307,255 |
| Orange County Collector | $ $140,880 |
| TOTAL | $25,989,585 |
| | |
| | |
| | |

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Less: Chapter 11 administrative expenses<br>(1)    Corcovelos Law group<br>Clerk of Court Fees $200.00<br>UST Fees $500.00 | $0<br>$200<br>$500 | |
| Less: Priority Claims | $.00 | |
| **Balance for unsecured Claims** | $.00 | |
| | | |
| | | |
| **Total amount of Unsecured Claims** | $2,375,196 | |
| **% OF THEIR CLAIMS WHICH UNSECURED CREDITORS** [1] **WOULD RECEIVE OR RETAIN IN A CHAPTER 7 LIQUIDATION:**[1] | .00% | |

6

| Proceeds From Liquidation of the Mammoth Property | $18,750,000 |
|---|---|
| Less: Orange County Tax Collector | ($140,880) |

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| **% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THIS PLAN:** | **Up to one hundred percent of their Allowed Claim** | |

Below is a demonstration, in tabular format, that all Creditors and interest holders will receive at least as much under the Plan as such Creditor or holder would receive under a Chapter 7 liquidation.

| | |
|---|---|
| Less: JP Morgan Chase Note 1 | ($16,546,450) |
| Less: JP Morgan Chase Note 2 | (9,307,255) |
| Balance Available for Chapter 7 Administrative Fees and Costs ($597,000), Chapter 11 Administrative Fees and Costs ($700.00) | $0 |
| Balance for Unsecured Claims | $.00 |
| | |
| | |
| | |
| | |

[1]    Note: If this percentage is greater than the amount to be paid to the unsecured Creditors on a "present value basis" under the Plan, the Plan is not confirmable unless Proponent obtains acceptance by every Creditors in an impaired class.

84

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100.00% | Estimated funds available for Administrative Claims would be $0 (Chapter 7 Administrative Fees and Costs are estimated at $597,000 and Chapter 11 Administrative Fees and Costs are estimated at $1,700.00) |
| Class 1 –Orange County Tax Collector | 100.00% | 100.00% |
| Class 2 – JP Morgan Chase . | 100.00% | 70% |
| Class 3 – JP Morgan Chase | 100.00% | 69% |
| Class 4 – General Unsecured Creditors. | 100% | 0% |
| Class 5 insider Unsecured's | 100% | 0% |
|  |  |  |
|  |  |  |
|  |  |  |

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| | | |
| Class 5 – Interest Holders | To receive pro-rata distribution of remaining Proceeds after payment of all Allowed Administrative Claims, all Allowed Secured Claims, all Allowed Priority Claims and all Allowed Unsecured Claims | 00% |

## C.    Feasibility

Another requirement for confirmation involve the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date.  The Plan Proponent maintains that this aspect of feasibility is satisfied as illustrated here:

Cash Debtor will have on hand by Effective Date      $1,000,000

**To Pay:** Administrative claims                          $1,700.00

**To Pay:** Statutory costs & charges                       0.00

Balance after paying these amounts…...........$298,300


The sources of the cash Debtor will have on hand by the Effective
Date, as shown above are:


    $1,000,000  New Value/Approximate cash in Debtors DIP
                 account

    $1,000,000  **Total**


    The second aspect considers whether the Proponent will have
enough cash over the life of the Plan to make the required Plan
payments.

    The Proponent has provided financial projections. Please
refer to Exhibit C for the relevant financial projections.  YOU
ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR
IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL
PROJECTIONS.

    In summary, the Plan proposes to pay the Class 1,2,3,and 4
creditors through the New Value contribution(s) net revenues
generated from the leasing of the Mammoth Property beginning on
the Effective date and or through the eventual sale or refinance
of the Mammoth Property.

  The final payment under the Plan is expected to be paid on
December 14, 2013.  The Plan Proponent contends that Debtor's
financial projections are feasible.

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

**V.    EFFECT OF CONFIRMATION OF PLAN**

A.    Discharge

This Plan provides that upon confirmation of the plan, Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan to the extent specified in 11 U.S.C. § 1141.  However, the discharge will not discharge any liability imposed by the Plan.

**B.    Revesting of Property in the Debtor**

Except as provided in Section {V.E.}, and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

**C.    Modification of Plan**

The Proponent of the Plan may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**D.    Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1 parties who have requested special notice.  Further status

2 reports shall be filed every 120 days and served on the same

3 entities.

4 **E.    Post-Confirmation Conversion/Dismissal**

5      A creditor or party in interest may bring a motion to

6 convert or dismiss the case under § 1112(b), after the Plan is

7 confirmed, if there is a default in performing the Plan.  If the

8 Court orders the case converted to Chapter 7 after the Plan is

9 confirmed, then all property that had been property of the

10 Chapter 11 estate, and that has not been disbursed pursuant to

11 the Plan, will revest in the Chapter 7, estate.  The automatic

12 stay will be reimposed upon the revested property, but only to

13 the extent that relief from stay was not previously authorized by

14 the Court during this case.

15      The order confirming the Plan may also be revoked under very

16 limited circumstances.  The Court may revoke the order if the

17 order of confirmation was procured by fraud and if a party in

18 interest brings an adversary proceeding to revoke confirmation

19 within 180 days after the entry of the order of confirmation.

20

21

22

23

24

25

26

27

28

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  **F.    Final Decree**

2      Once the estate has been fully administered as referred to

3  in Bankruptcy Rule 3022, the Plan Proponent, or such other party

4  as the Court shall designate in the Plan Confirmation Order,

5  shall file a motion with the Court to obtain a final decree to

6  close the case.

7                              Respectfully submitted,

8

9  DATED: June 1, 2010

10  MAMMOTH SAN JUAN CAPISTRANO I LLC
   A California Limited Liability Company

11

12  By: _____
   Robert Wish

13  Managing Member of Mammoth Equities LLC
   The manager of MAMMOTH SAN JUAN CAPISTRANO I LLC

14

15

16  PRESENTED BY:
   Corcovelos Law group

17  BY:    /s/Thomas C Corcovelos
   Thomas C Corcovelos

18

19  Attorneys for Debtor and
   Debtor in Possession

20

21

22

23

24

25

26

27

28

Corcovelos Law Group
Attorneys at Law
1001 Sixth Street Suite 150
Manhattan Beach, California 90266

# VI.

## SUPPORTING DECLARATIONS

### (a)    DECLARATION OF ROBERT WISH

I, Robert Wish, declare as follows:

(2)    I am the managing member of Mammoth Equities LLC, the Manager of the debtor and debtor in possession in the bankruptcy case of In re. **MAMMOTH SAN JUAN CAPISTRANO I LLC**, Case No. 8:09-bk-16836

1.    I make this declaration in support of approval of Debtor's Disclosure Statement Describing Debtor's Chapter 11 Plan of Reorganization (the "Disclosure Statement"). I have personal knowledge of the matters set forth in this Declaration and if called upon to testify, I could and would testify competently thereto.

2.    I have read the Disclosure Statement and, to the best of my knowledge, all of the information contained therein is true and correct.

3.    I have solicited the Interest Holders and between the Interest Holders and me, we will contribute $1,000,000 in New Value on the Effective Date to be utilized to pay a principal reduction payment to JP Morgan Chase under the plan.

4.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 1, 2010 at San Juan Capistrano, California.

_____
Robert Wish

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  **F.    Final Decree**

2       Once the estate has been fully administered as referred to

3  in Bankruptcy Rule 3022, the Plan Proponent, or such other party

4  as the Court shall designate in the Plan Confirmation Order,

5  shall file a motion with the Court to obtain a final decree to

6  close the case.

7                          Respectfully submitted,

8

9  DATED: June 10, 2010

10 MAMMOTH SAN JUAN CAPISTRANO I LLC
   A California Limited Liability Company

11

12 By: _____
        Robert Wish

13      Managing Member of Mammoth Equities LLC
        The manager of MAMMOTH SAN JUAN CAPISTRANO I LLC

14

15

16 PRESENTED BY:
   Corcovelos Law group

17 BY:   /s/Thomas C Corcovelos
         Thomas C Corcovelos

18

19 Attorneys for Debtor and
   Debtor in Possession

20

21

22

23

24

25

26

27

28

                          90

**VI.**

**SUPPORTING DECLARATIONS**

(a)     <u>**DECLARATION OF ROBERT WISH**</u>

I, Robert Wish, declare as follows:

(2)    I am the managing member of Mammoth Equities LLC, the Manager of the debtor and debtor in possession in the bankruptcy case of <u>In re</u>. **MAMMOTH SAN JUAN CAPISTRANO I LLC**, Case No. 8:09-bk-16836

1.     I make this declaration in support of approval of Debtor's Disclosure Statement Describing Debtor's Chapter 11 Plan of Reorganization (the "Disclosure Statement").  I have personal knowledge of the matters set forth in this Declaration and if called upon to testify, I could and would testify competently thereto.

2.     I have read the Disclosure Statement and, to the best of my knowledge, all of the information contained therein is true and correct.

3.     I have solicited the Interest Holders and between the Interest Holders and me, we will contribute $1,000,000 in New Value on the Effective Date to be utilized to pay a principal reduction payment to JP Morgan Chase under the plan.

4.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 10, 2010 at San Juan Capistrano, California.

_____
Robert Wish

91

**EXHIBIT A**

**- LIST OF ALL ASSETS**

1)    A two-story 83,466 gross sf fully improved office building with 54 individual units located at 29222 Rancho Viejo Road, San Juan Capistrano, CA., further described below:

| | |
|---|---|
| Foundation: | Poured Concrete |
| Construction: | Steel |
| Exterior Walls | |
| Windows: | Glass and concrete/Aluminum frame dual pane tinted glass |
| Roof: | Peaked steel plate joist system |
| Walls: | Painted drywall with variations to tenant specifications |
| Floor Coverings: | Commercial grade short loop carpet over concrete |
| Ceilings: | Typically suspended acoustic ceiling pads |
| Lighting: | Suspended and recessed fluorescent and incandescent lighting |
| HVAC: | Roof-top mounted head pump systems operated by thermostats and time clocks |
| Electrical: | 1200 amp, 227/480V, 3-phase, 4-wire.  Tenant spaces are separately measured for electrical – each tenant has its own electric meter |
| Restrooms: | One men's and one women's restroom per floor |
| Fire Protection: | 100% wet sprinkler system |
| Elevators: | Two 3,500 lb. capacity Otis hydraulic |

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Parking Ratio:        1/3.30

2)    A two-story 44,938 gross sf fully improved office building with 26 individual units located at 29122 Rancho Viejo Road, San Juan Capistrano, CA. further described below.

| | |
|---|---|
| Foundation: | Poured Concrete |
| Construction: | Steel |
| Exterior Walls | |
| Windows: | Glass and concrete/Aluminum frame dual pane tinted glass |
| Roof: | Peaked steel plate joist system |
| Walls: | Painted drywall with variations to tenant specifications |
| Floor Coverings: | Commercial grade short loop carpet over concrete |
| Ceilings: | Typically suspended acoustic ceiling pads |
| Lighting: | Suspended and recessed fluorescent and incandescent lighting |
| HVAC: | Roof-top mounted head pump systems operated by thermostats and time clocks |
| Electrical: | 1200 amp, 227/480V, 3-phase, 4-wire.  Tenant spaces are separately measured for electrical – each tenant has its own electric meter |
| Restrooms: | One men's and one women's restroom per floor |
| Fire Protection: | 100% wet sprinkler system |
| Elevators: | Two 3,500 lb. capacity Otis hydraulic |
| Parking Ratio: | 1/3.30 |

1  3) Personal Property consisting of furniture fixtures and

2  equipment

3

4  4) Mammoth Adversary Proceeding

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

**EXHIBIT B – List of Litigation/Summary of Litigation**

MAMMOTH SAN JUAN CAPISTRANO, LLC, ETC, AND MAMMOTH
EQUITIES,LLC, ETC, ET AL.  VS  JP MORGAN CHASE BANK, F.A., ETC,
ET AL.," case No. 00120389 filed in state court and subsequently
filed as an adversary proceeding in bankruptcy court and whose
case in bankruptcy court is known as Mammoth Equities LLC vs. JP
Morgan Chase Bank NA case # 8:09-ap-01433-RK filed on July 17,
2009.

The March 26, 2009 non-judicial foreclosure proceedings
initiated by JP Morgan Chase against the Debtor.

**SUMMARY OF LAWSUIT WITH WAMU/JPMORGAN CHASE**

On March 20, 2009, Debtor, and its sole manager. Mammoth Equities, LLC
(**"Mammoth"**), as borrower and guarantor respectively, under the WaMu Loans, filed an
action in the Orange County Superior Court, Central Division (the **"State Court"**) entitled
"MAMMOTH  SAN JUAN CAPISTRANO, LLC, ETC, AND MAMMOTH EQUITIES,LLC,
ETC, ET AL.  VS  JPMORGAN CHASE BANK, F.A., ETC, ET AL.,"  Case No. 00120389
(the **"Debtor's Lawsuit"**).

Defendant JPMorgan Chase Bank (**"JPM"**) was notified of the filing of Debtor's Lawsuit
and the impending service of same on Friday, March 20, 2009, and was served
personally served Monday, March 23, 2009. Defendant Washington Mutual Bank, N.A.
was also served on March 23, 2009. Debtor's Lawsuit asserts a number of claims based
on improper lender conduct which damaged Debtor and directly prevented Debtor's
performance under the WaMu Loans, and frustrated Debtor's ability to realize the
benefits of the loans.  The details regarding the nature and factual basis for those claims

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  is set forth below in the section  B, below, entitled  "Basis of Debtor's Lawsuit."

2

3  In response to Debtor's Lawsuit, JPM filed a separate suit in the State Court against

4  Debtor and Mammoth, entitled "JPMORGAN CHASE, N.A., ETC. vs. MAMMOTH SAN

5  JUAN CAPISTRANO, LLC AND MAMMOTH EQUITIES,LLC, ETC, ET AL," Case No.

6  00120442 (the **"Lender's Lawsuit"**).  Lender's Lawsuit, which was filed on March 23,

7  2009 (three (3) days after the filing of Debtor's Lawsuit), sought, among other things, the

8  appointment of a receiver and enforcement of Mammoth's Guaranty of each of the

9  Loans.

10  **A.  PROCEEDINGS IN THE STATE COURT AND CURRENT PROCEDURAL**

11  **STATUS.**

12  In March 2009, JPM made an ex parte application to the State Court for the immediate

13  appointment of Taylor B. Grant as receiver for the Property. JPM's ex parte application

14  failed, among other things, to advise the State Court of the prior filing and service upon

15  JPM of the Debtor's Lawsuit. The Judge denied JPM's receivership application.  In

16  March 2009, the State Court deemed the Debtor's lawsuit "related" to the Lender's

17  Lawsuit, and consolidated the two actions with Lender's Lawsuit effectively becoming a

18  cross-complaint to Debtor's complaint. Also in March 2009 JPM filed a peremptory

19  challenge with the State Court to Judge Glass, whereupon the consolidated actions in

20  the State Court were reassigned to the Judge DiCesare.  Judge DiCesare made no

21  rulings on the case.  The Debtor's peremptory challenge to Judge DiCesare, filed on or

22  about April 2009, resulted in the consolidated action being transferred to the Honorable

23  Charles Margines(Dept. C-19).

24   After several unsuccessful attempts by JPM to specially set an earlier hearing or

25  advance the hearing date on its renewed application for appointment of receiver, the

26  State Court finally heard JPM's application of July 1, 2009. The State Court's written

27  tentative ruling was to deny the application; however, upon taking the matter under

28  submission, on July 7, 2009, the State Court reversed its tentative ruling and entered its

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  own form of "Order Appointing Receiver."  **("Receivership Order")**   The State Court

2  rejected JPM's proposed form of receivership order, including JPM's nomination of

3  Taylor B. Grant as receiver, and instead appointed James Skorheim , Esq., as receiver.

4  The Receivership Order contained an express, but highly unusual, provision staying the

5  execution of the order and directing that "the receiver shall not assume it position and

6  responsibilities" for a period of 10 days "to allow Mammoth to appeal and to obtain an

7  order from the Appellate court enjoining and restraining this order from going into effect."

8  Debtor was never served with the Receivership Order or otherwise notified of the

9  Receivership Order until the afternoon of July 8, 2009, at which time Debtor was

10 contacted by the receiver who was seeking to take possession of the Property and

11 Debtor's files and accounts.  However, Debtor, based on the other factors (such as

12 inability to collect rents and pay operating expenses based on JPM's below-described

13 "Tenant Notices"), had already independently elected to file its Chapter 11 petition herein

14 and in fact had filed its petition before having been notified by the receiver of the entry of

15 the Receivership Order.

16

17 **B.  BASIS OF DEBTOR'S LAWSUIT.**

18 Debtor's Lawsuit sets forth four (4) separate causes of action against WaMu and its

19 purported successor-in-interest under the WaMu Loan, JPM, for "Declaratory Relief,"

20 "Injunctive Relief," "Breach of Contract," and "Breach of Covenant of Good Faith and Fair

21 Dealing," each of which is based on one or more instances of improper conduct by

22 WaMu or JPM (**"Lenders"**) occurring either before or after January 1, 2009 stated

23 Maturity Date.  The improper and damaging actions of Lenders alleged in Debtor's

24 Lawsuit include:

25       1. **Lender's Failure to Timely Approve a Lot Line Adjustment ("LLA") and**

26 **Permit "Un-crossing" of Loans, Thereby Preventing Debtor's Ability to Sell or**

27 **Refinance the Buildings Prior to Maturity.**  At the inception of the WaMu Loans in

28 December 2006, the Lot Line separating the North Building Parcel from the South

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  Building Parcel ran under the South Building.  Accordingly, and for this reason alone,

2  each of the original WaMu Loans contained a "Cross-collateralization" provision which

3  permitted the Lender, in the event of a default under either Loan, to foreclose against

4  both Parcels.  However, because the Cross-Collateralization provision also effectively

5  prevented Debtor from selling refinancing or otherwise disposing of either the North

6  Building or the South Building without first paying off both Building Loans, Debtor

7  required an "Addendum" be signed by WaMu for each of the Loans, which expressly

8  required the Lender to reasonably and promptly approve an LLA moving the Lot Line to

9  a point between the two buildings, at which time the Loans would be "un-crossed," i.e.,

10  the Cross-Collateralization provision of each of the Loans would be forever extinguished.

11  Debtor alleges that WaMu unreasonably and intentionally delayed in approving the LLA

12  and un-crossing the Loans during 2008 for a period of almost eight (8) months, in an

13  attempt to "run the clock out" on Debtor, and retain its superior "cross-collateralized"

14  position for as long as possible, even though such delay directly caused Debtor to lose a

15  fully negotiated sale of the South Building ,as well as separate refinance opportunity,

16  either of which would have closed and paid off the South Building Loan well in advance

17  of Maturity Date.  Debtor estimates that its damages for Lender's intentional delay in

18  approving the LLA and un-crossing the Loans is no less than $10,000,000.

19      **2.  Other Improper and Damaging Actions By Lenders Occurring After**

20  **January 1, 2009.**  Debtor's Lawsuit further alleges that, after the January 1, 2009

21  Maturity Date, Lenders continued to engage in a course of conduct that was

22  unreasonable, improper, damaging, and which further impaired and interfered with

23  Debtor's ability to sell, refinance, cure, or otherwise appropriately respond to the issues

24  presented by and solutions available for the fully-matured Loans. These post-maturity

25  actions by Lenders included, without limitation:

26      -- Issuing conflicting, confusing and unreasonable demands upon Debtor, such as

27  demand that, for a 60-90 day extension of the Loans, Debtor make an immediate

28  payment to Lender of $6 million, re-cross the Loans, and provide financial and credit

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  authorization forms for Mr. Robert Wish, who is neither a borrower nor a guarantor under

2  the Loans.

3  　　--Improperly and menacingly asserting that, despite a signed "Modification

4  Agreement" for each of the Loans recorded in October, 2008 which un-crossed the

5  Loans and created new collateral descriptions for each separate Parcel securing each

6  separate Loan, that the Loans were still "cross-collateralized."

7  　　--Tendering to Debtor an oppressive "Pre-negotiation Agreement" to Debtor as a

8  pre-requisite to any work-out discussions, which Lenders stated was a "non-negotiable"

9  form, and which contained confusing and deceptive language regarding suggesting,

10  among other things, that the Loans were still "cross-collateralized."

11  　　--Referring Debtor to, and actively encouraging Debtor to pursue a supposed

12  source of financing to pay off the Loans, who turned out to be a personal acquaintance

13  of the primary loan officer administering the Loans, working with suspicious "offshore"

14  entities, which proposed exotic and highly questionable financing structures to Debtor.

15  　　**3. Other Improper Actions by Lender Leading up To the Bankruptcy Filing.**

16  Although not yet separately alleged in the Debtor's Lawsuit, JPM engaged in additional

17  illegal or improper acts since the filing of the Debtor's Lawsuit which have further

18  damaged Debtor and which, among other things, directly contributed to the necessity of

19  Debtor's Chapter 11 filing:

20  　　--**Defective Notice of Default.**   On March 26, 2009, JPM commenced its non-

21  judicial foreclosure proceedings against the Buildings by caused Notices of Default to be

22  recorded with respect to each of the Loans.  Debtor contends that each of the Notices of

23  Default was defective on its face and made written demand upon both JPM and the

24  foreclosure trustee to cancel the defective Notices of Default.  The basis of Debtor's

25  demand was that each of the Notices contained false and misleading information

26  regarding the real property being foreclosed on under each Notice.  Each of the Notices

27  of Default (i.e., the separate Notice the for North Building Loan and the separate Notice

28  for the South Building Loan, omitted the separate legal description for the corresponding

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1  North Parcel or South Parcel, respectively; instead, each Notice described the real

2  property by an Assessor's Tax Parcel Number ("APN: 650-011-32"), which includes both

3  the North Parcel and the South Parcel. Thus, each Notice of Default purported to initiate

4  a foreclosure for each Loan against both Parcels, which created confusion and which

5  meant, among other things, that it would not be possible to prevent foreclosure under

6  either of the Notices by paying off only one of the Loans.  JPM and the foreclosure

7  trustee rejected Debtor's demands to cancel and re-issue the Notices of Defaults, but

8  failed to clarify or assure Debtor that it was not seeking to foreclose against both Parcels

9  for each Loan (i.e., that it was not seeking to still treat the Loans as "cross-

10 collateralized").  However, Debtor contends that JPM and the foreclose trustee admitted

11 that the Notices of Default were defective in that, among other things, the Notices of

12 Sale recorded for each of the Loans on or about July 3, 2009, did not repeat the same

13 mistake and defect as in the Notices of Default, and were careful to use the separate

14 legal description for each Parcel as opposed to the common and misleading APN.

15 Debtor contends that the Notices of Sale could not, as a matter of law, retroactively cure

16 the defective Notices of Default.

17 　　**--Notices to Tenants to Pay Rent.**  On or about June __, 2009, without any prior

18 notice to Debtor, and in the middle of settlement negotiations as Debtor was expecting a

19 counterproposal from JPM, JPM served each of the Property's tenants with a written

20 notice demanding that each of the tenants commence making rent payments to JPM

21 instead of Debtor.  **("Tenant Notice")**  The Tenant Notice purported to be pursuant to

22 the provisions of California Civil Code section 2938(_)(_), which provides alternative

23 methods for a real-property secured lender  to enforce its security interest in rents,

24 issues and profits. However, Debtor contends that JPM did not comply with Civil Code

25 section 2938 in that, among other things, JPM failed to account for rent monies collected

26 and use those monies to pay the Properties expenses, and that Tenant Notice failed to

27 comply with the provisions of JPM's Deeds of Trust regarding the content of any such

28 Tenant Notice. Debtor advised JPM of these problems and of the fact that the Tenant

Notices had caused confusion and concern among the tenants (most of them small business owners), which caused the tenants to stop paying rent altogether, thereby damaging the Property and effectively cutting off Debtor's ability to pay necessary operating expenses for the Property.  JPM ignored all of Debtor's demands and admonitions regarding the Tenant Notices, and rejected each of Debtor's proposals for a consensual agreement to protect and sequester the rents, while also providing for the payment of the Property's bills.

**--Violation of State Court Stay on Enforcement of Receivership Order.**  As set forth above in the "Procedural Status" section, the State Court's July 7, 2009 Receivership Order contained an express 10-day stay of enforcement provision. Debtor believes that notwithstanding this provision, JPM willfully violated this stay by, among other things, immediately and aggressively instructing the Receiver to seize control and possession of the Property within hours of the entry of the Receivership Order, i.e., during the 10-day stay period and before the Receiver had been "qualified" with the State Court by posting his bond, and before the Debtor had even been served with the Receivership Order.

1

## EXHIBIT C – FINANCIAL PROJECTIONS

2

This information is supplied by <u>the Debtor</u> and is based on

3

Debtors development experience in Orange County.

4

5

6

**MAMMOTH SAN JUAN CAPISTRANO I LLC Financial Projections**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

Exhibit C

**San Juan Capistrano South** 29222 Rancho Viejo Rd.
Schedule Of Prospective Cash Flow    San Juan Capistrano, CA 92675
**3.5 Year Projections**

*Note 36% = Pro Rata share for North Building / 64% = Pro Rata share for South Building*

| For the Months | PLAN START Jun-2010 | Month 1 Jul-2010 | Month 2 Aug-2010 | Month 3 Sep-2010 | Month 4 Oct-2010 | Month 5 Nov-2010 | Month 6 Dec-2010 | Month 7 Jan-2011 | Month 8 Feb-2011 | Month 9 Mar-2011 | Month 10 Apr-2011 | Month 11 May-2011 | Month 12 Jun-2011 | Month 13 Jul-2011 | Month 14 Aug-2011 | Month 15 Sep-2011 | Month 16 Oct-2011 | Month 17 Nov-2011 | Month 18 Dec-2011 | Month 19 Jan-2012 | Month 20 Feb-2012 | Month 21 Mar-2012 | Month 22 Apr-2012 | Month 23 May-2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual Occupancy | 59.82% | 62.37% | 63.71% | 65.69% | 67.54% | 62.04% | 63.10% | 69.62% | 71.08% | 72.21% | 75.78% | 77.90% | 78.16% | 81.53% | 82.75% | 84.94% | 90.54% | 87.38% | 90.74% | 94.26% | 89.81% | 91.95% | 91.79% | 91.17% |
| **Potential Gross Revenue** | | | | | | | | | | | | | | | | | | | | | | | | |
| Base Rental Revenue | **$114,838** | $116,117 | $116,256 | $119,556 | $120,857 | $120,794 | $122,546 | $123,597 | $126,218 | $128,699 | $135,887 | $139,135 | $142,689 | $148,973 | $152,375 | $155,006 | $158,477 | $160,295 | $170,359 | $172,449 | $171,828 | $172,056 | $172,233 | $172,640 |
| Absorption & Turnover Vacancy | (2,874) | (3,475) | (1,745) | (1,744) | (3,244) | (4,531) | (10,574) | (588) | (588) | (1,320) | (2,702) | (2,367) | (5,988) | (6,690) | (6,834) | (7,804) | (1,980) | (9,755) | (10,710) | (10,218) | (16,128) | (13,460) | (8,521) | (14,924) |
| Base Rent Abatement | (6,675) | (3,660) | (3,034) | (3,244) | (4,531) | (4,467) | (5,985) | (5,520) | (6,229) | (2,668) | (2,970) | (5,087) | (2,852) | (3,741) | (8,885) | (4,679) | (3,540) | (8,867) | (3,513) | (7,703) | (8,003) | (4,836) | (3,142) | (8,363) |
| Scheduled Base Rental Revenue | 105,289 | 108,982 | 111,477 | 114,568 | 116,326 | 105,957 | 107,489 | 117,489 | 119,401 | 124,711 | 130,215 | 131,681 | 133,849 | 138,542 | 134,656 | 142,523 | 152,957 | 141,673 | 155,772 | 154,528 | 147,695 | 153,760 | 160,570 | 149,353 |
| Expense Reimbursement Revenue | | | | | | | | 1,125 | 1,120 | 1,101 | 1,142 | 1,073 | 1,089 | 1,046 | 1,023 | 1,038 | 917 | 930 | 2,109 | 1,904 | 1,812 | 1,728 | 1,460 | |
| Janitorial Service | 2,498 | 2,646 | 2,725 | 2,844 | 2,956 | 2,627 | 2,688 | 3,394 | 3,495 | 3,574 | 3,828 | 3,983 | 4,002 | 4,254 | 4,347 | 4,515 | 4,958 | 4,706 | 5,136 | 5,788 | 5,483 | 5,607 | 5,865 | 5,525 |
| **Total Potential Gross Revenue** | 107,787 | 111,628 | 114,202 | 117,412 | 119,282 | 108,585 | 110,176 | 122,008 | 124,016 | 129,386 | 135,185 | 136,784 | 138,924 | 143,885 | 140,049 | 148,061 | 158,953 | 147,296 | 162,425 | 155,082 | 161,179 | 168,163 | 166,338 | 156,338 |
| General Vacancy | | | | | | | | | | | | | | | | | | | | | | | | |
| Collection Loss | (1,026) | (1,025) | (1,026) | (1,025) | (1,026) | (1,026) | (1,026) | (1,353) | (1,353) | (1,353) | (1,353) | (1,353) | (1,353) | (1,353) | (1,353) | (1,353) | (1,352) | (1,353) | (1,353) | (1,540) | (1,540) | (1,539) | (1,540) | (1,540) |
| Effective Gross Revenue | 106,761 | 110,603 | 113,176 | 116,387 | 118,256 | 107,650 | 120,655 | 122,663 | 128,033 | 133,832 | 135,431 | 137,571 | 142,532 | 138,696 | 146,708 | 157,601 | 145,943 | 160,485 | 160,885 | 153,542 | 159,640 | 166,623 | 154,798 | |
| **Operating Expense** | | | | | | | | | | | | | | | | | | | | | | | | |
| Alarm Monitoring | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 |
| Elevator Maintenance | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 |
| HVAC | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Insurance | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 |
| Janitoria | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 |
| Landscaping | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| Maintenance & Repairs | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Pool/Fountain Main | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 |
| Property Mgmt Fee | 5,138 | 5,530 | 5,659 | 5,819 | 5,913 | 5,368 | 5,382 | 6,033 | 6,133 | 6,402 | 6,692 | 6,771 | 6,879 | 7,126 | 6,935 | 7,335 | 7,880 | 7,297 | 8,025 | 8,044 | 7,677 | 7,982 | 8,331 | 7,740 |
| Property Taxes | | | | | | | 73,440 | | | | | 73,440 | | | | | | | 74,909 | | | | | 74,909 |
| Security Patro | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Sweeping | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 |
| Trash Removal | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 |
| Utilities | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 |
| NR Advertising | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 |
| NR Directories/Door Names | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 |
| NR Janitoria | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 |
| NR Janitorial - Single Room | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| NR Leasing Exp | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 |
| NR Maintenance & Repair | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| NR Turnover Exp | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| NR Utilities | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Chapter 11 Admin FEE (64%) | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 |
| PROMOTION phone and internet | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| OPERATING EXPENSES | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| MISC/Contingency | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| **Total Operating Expense** | 26,097 | 26,489 | 26,618 | 26,778 | 26,872 | 26,327 | 99,781 | 26,992 | 27,092 | 27,361 | 27,651 | 101,091 | 27,838 | 28,085 | 27,894 | 28,294 | 28,839 | 28,256 | 103,893 | 28,003 | 27,636 | 27,941 | 28,290 | 103,199 |
| **Net Operating Income** | 80,664 | 84,114 | 86,558 | 89,609 | 91,384 | 81,027 | 7,869 | 93,663 | 95,571 | 100,672 | 32,741 | 107,701 | 109,733 | 114,447 | 110,802 | 118,414 | 128,762 | 117,687 | 56,592 | 132,882 | 125,906 | 131,699 | 63,424 | 127,099 |
| **Debt Service (interest rate** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.50% | 6.50% | 6.50% | 6.50% | 6.50% | 6.50% |
| Interest Payments (Principal $16,546,449) | 68,944 | 68,944 | 68,944 | 68,944 | 68,944 | 68,944 | 75,838 | 75,838 | 75,838 | 75,838 | 75,838 | 75,838 | 82,732 | 82,732 | 82,732 | 82,732 | 82,732 | 82,732 | 89,627 | 89,627 | 89,627 | 89,627 | 89,627 | 89,627 |
| Class 4 Creditors Interest at 3% $30,000 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| Class 4 Creditors Balloon ($30,000 * 64% | | | | | | | | | | | | | | | | | | | | | | | | |
| Class 5 Creditors Balloon (64%) in 42nd month | | | | | | | | | | | | | | | | | | | | | | | | |
| Taxes Paid pursuant reorg plan (64% $140,880) | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 |
| **Total Debt Service** | 71,435 | 71,435 | 71,435 | 71,435 | 71,435 | 71,435 | 78,329 | 78,329 | 78,329 | 78,329 | 78,329 | 78,329 | 85,224 | 85,224 | 85,224 | 85,224 | 85,224 | 85,224 | 92,118 | 92,118 | 92,118 | 92,118 | 92,118 | 92,118 |
| **Leasing & Capital Cost** | | | | | | | | | | | | | | | | | | | | | | | | |
| Tenant Improvement | 1,063 | 1,023 | 1,035 | | 535 | | | 3,271 | | 170 | | 417 | 401 | 285 | 1,503 | 490 | 2,209 | 191 | 417 | 2,745 | 859 | 2,210 | 2,673 | 1,465 |
| Leasing Commissions (6% / 2%) | 7,264 | 3,173 | 2,834 | 4,328 | 3,401 | 1,946 | 2,572 | 8,476 | 3,036 | 4,132 | 10,514 | 5,644 | 6,405 | 9,514 | 8,929 | 4,580 | 13,164 | 4,411 | 16,050 | 8,192 | 2,364 | 4,658 | 7,068 | 3,800 |
| Capital Expenditures - 12 sq f | 746 | 747 | 746 | 747 | 746 | 747 | 747 | 747 | 769 | 769 | 769 | 769 | 769 | 768 | 769 | 768 | 769 | 769 | 792 | 792 | 792 | 792 | 792 | 792 |
| **Total Leasing & Capital Cost** | 9,073 | 4,943 | 4,615 | 5,075 | 4,682 | 2,693 | 3,319 | 12,516 | 3,805 | 5,071 | 11,283 | 6,830 | 7,575 | 10,568 | 11,217 | 5,839 | 16,142 | 5,371 | 17,259 | 11,729 | 4,015 | 7,660 | 10,533 | 6,057 |
| **Cash Flow After Debt Service But Before Taxes** | $156 | $7,736 | $10,508 | $13,099 | $15,267 | $6,899 | ($73,779) | $2,818 | $13,437 | $17,272 | ($56,871) | $22,542 | $16,934 | $18,655 | $14,361 | $27,351 | $27,396 | $27,342 | ($52,761) | $29,035 | $29,773 | $31,921 | ($39,227) | $28,924 |
| Cummulative Cash on Hand | $237,302 | $245,038 | $255,546 | $268,645 | $283,912 | $290,811 | $217,031 | $219,849 | $233,285 | $250,557 | $193,686 | $216,227 | $233,161 | $251,817 | $266,178 | $293,529 | $320,925 | $348,268 | $295,506 | $324,541 | $354,314 | $386,235 | $347,008 | $375,932 |
| Cash Flow Before DS | $71,591 | $79,171 | $81,943 | $84,534 | $86,702 | $78,334 | $4,550 | $81,147 | $91,766 | $95,601 | $21,458 | $100,871 | $102,158 | $103,879 | $99,585 | $112,575 | $112,620 | $112,566 | $39,357 | $121,153 | $121,891 | $124,039 | $52,891 | $121,042 |
| DSCR | | 1.15 | 1.18 | 1.21 | 1.10 | 0.06 | 1.04 | 1.17 | 1.22 | 0.27 | 1.29 | 1.20 | 1.22 | 1.17 | 1.32 | 1.32 | 1.32 | 0.43 | 1.32 | 1.32 | 1.35 | 0.57 | 1.31 | |

**Building Sale at 42nd Month --->**
Cost of sale (5%)
Pay off Unsecured Creditors (64%) in 42nd
Pay off of Principal

| Building Sale at 42nd Month | $23,222,800 | 6.5 CAP |
|---|---|---|
| Cost of sale (5%) | $ 1,161,140 | |
| Pay off Principal | $16,546,449 | |
| Pay off of Class 5 Creditors Balloon (64%) in 42n | $ 1,658,523 | |
| Proceeds from Sale | $ 3,856,688 | |

**Building Refinance at 42nd Month --->**
Cost of refinance (1.5%)
Pay off Unsecured Creditors Balloon (64%) in 42n
Pay off of Principal

| Building Refinance at 42nd Month | $19,500,000 |
|---|---|
| Cost of refinance (1.5%) | $292,500.00 |
| Pay off Principal | $16,546,449 |
| Pay off of Class 5 Creditors Balloon (64%) in 42n | $ 1,658,523 |
| Proceeds from Refinance | $ 1,002,528 |

Exhibit C

*Note 36% = Pro Rata share for North Building
64% = Pro Rata share for South Building

| For the Months | Month 24 Jun-2012 | Month 25 Jul-2012 | Month 26 Aug-2012 | Month 27 Sep-2012 | Month 28 Oct-2012 | Month 29 Nov-2012 | Month 30 Dec-2012 | Month 31 Jan-2013 | Month 32 Feb-2013 | Month 33 Mar-2013 | Month 34 Apr-2013 | Month 35 May-2013 | Month 36 Jun-2013 | Month 37 Jul-2013 | Month 38 Aug-2013 | Month 39 Sep-2013 | Month 40 Oct-2013 | Month 41 Nov-2013 | Month 42 Dec-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual Occupancy | 91.36% | 95.93% | 97.77% | 93.60% | 93.60% | 95.32% | 91.63% | 90.11% | 92.44% | 93.82% | 91.69% | 93.29% | 92.92% | 92.53% | 89.44% | 98.49% | 96.49% | 95.76% | 92.78% |
| | | | | | | | | | | | | | | | | | | | |
| Potential Gross Revenue | | | | | | | | | | | | | | | | | | | |
| Base Rental Revenue | 172,895 | 172,953 | 173,233 | 173,767 | 174,162 | 174,256 | 174,393 | 176,148 | 176,529 | 177,459 | 178,966 | 179,538 | 180,302 | 181,709 | 182,909 | 183,745 | 184,769 | 185,678 | 187,729 |
| Absorption & Turnover Vacancy | (17,695) | (15,447) | (14,503) | (15,633) | (15,219) | (7,233) | (3,911) | (12,229) | (12,220) | (9,234) | (16,301) | (18,885) | (14,386) | (11,717) | (15,902) | (12,949) | (13,818) | (14,630) | (20,370) |
| Base Rent Abatements | (3,400) | (7,593) | (10,504) | (3,916) | (6,674) | (6,042) | (6,226) | (3,468) | (6,353) | (3,538) | (8,525) | (2,180) | (5,671) | (5,717) | (5,329) | (3,295) | (9,045) | (5,486) | (3,049) |
| | | | | | | | | | | | | | | | | | | | |
| Scheduled Base Rental Revenue | 151,800 | 149,913 | 148,226 | 154,218 | 152,269 | 160,981 | 164,256 | 160,451 | 157,956 | 164,687 | 154,140 | 158,473 | 160,245 | 164,275 | 161,678 | 167,501 | 161,906 | 165,562 | 164,310 |
| Expense Reimbursement Revenue | 1,323 | 1,159 | 1,068 | 886 | 793 | 793 | 768 | 1,424 | 1,379 | 1,388 | 1,218 | 1,190 | 1,133 | 973 | 915 | 873 | 764 | 711 | 629 |
| Janitorial Service | 5,389 | 5,509 | 5,566 | 5,510 | 5,526 | 5,943 | 6,112 | 6,301 | 6,302 | 6,474 | 6,106 | 5,957 | 6,186 | 6,324 | 6,112 | 6,271 | 6,234 | 6,194 | 5,892 |
| | | | | | | | | | | | | | | | | | | | |
| Total Potential Gross Revenue | 158,512 | 156,581 | 154,860 | 160,614 | 158,588 | 167,717 | 171,136 | 168,176 | 165,637 | 172,549 | 161,464 | 165,620 | 167,564 | 171,572 | 168,705 | 174,645 | 168,904 | 172,467 | 170,831 |
| General Vacancy | | | | | | | | | | | | | | | | | | | |
| Collection Loss | (1,539) | (1,540) | (1,540) | (1,539) | (1,540) | (1,540) | (1,539) | (1,618) | (1,618) | (1,617) | (1,618) | (1,618) | (1,617) | (1,618) | (1,618) | (1,617) | (1,618) | (1,618) | (1,817) |
| | | | | | | | | | | | | | | | | | | | |
| Effective Gross Revenue | 156,973 | 155,041 | 153,320 | 159,075 | 157,048 | 166,177 | 169,597 | 166,558 | 164,019 | 170,932 | 159,846 | 164,002 | 165,947 | 169,954 | 167,087 | 173,028 | 167,286 | 170,849 | 169,214 |
| | | | | | | | | | | | | | | | | | | | |
| Operating Expense | | | | | | | | | | | | | | | | | | | |
| Alarm Monitoring | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 |
| Elevator Maintenance | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 | 602 |
| HVAC | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Insurance | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 |
| Janitoria | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 | 1,298 |
| Landscaping | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| Maintenance & Repairs | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Pool/Fountain Main | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 | 782 |
| Property Mgmt Fee | 7,849 | 7,752 | 7,666 | 7,954 | 7,852 | 8,309 | 8,480 | 8,328 | 8,201 | 8,547 | 7,992 | 8,200 | 8,297 | 8,498 | 8,354 | 8,651 | 8,364 | 8,543 | 8,461 |
| Property Taxes | | | | | | | 76,407 | | | | 76,407 | | | | | | | | 77,935 |
| Security Patro | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Sweeping | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 |
| Trash Removal | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 | 534 |
| Utilities | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 | 3,075 |
| NR Advertising | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 |
| NR Directories Door Names | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 |
| NR Janitoria | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 |
| NR Janitorial - Single Room | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| NR Leasing Exp | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 |
| NR Maintenance & Repairs | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| NR Turnover Exp | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| NR Utilities | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Chapter 11 Admin FEE (64%) | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 | 960 |
| PROMOTION (phone and internet | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| OPERATING EXPENSES | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| MISC/Contingency | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| | | | | | | | | | | | | | | | | | | | |
| Total Operating Expense | 27,808 | 27,711 | 27,625 | 27,913 | 27,811 | 28,268 | 104,846 | 28,287 | 28,160 | 28,506 | 104,358 | 28,159 | 28,256 | 28,457 | 28,313 | 28,610 | 28,323 | 28,502 | 106,355 |
| | | | | | | | | | | | | | | | | | | | |
| Net Operating Income | 129,165 | 127,330 | 125,695 | 131,162 | 129,237 | 137,909 | 64,751 | 138,271 | 135,859 | 142,426 | 55,488 | 135,843 | 137,691 | 141,497 | 138,774 | 144,418 | 138,963 | 142,347 | 62,859 |
| | | | | | | | | | | | | | | | | | | | |
| Debt Service (interest rate | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | **7.00%** | 7.00% |
| Interest Payments (Principal $16,546,449 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 | 96,521 |
| Class 4 Creditors Interest at 3% $30,000 (64% | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| Class 4 Creditors Balloon ($30,000 * 64% | | | | | | | | | | | | | | | | | | | 19,200 |
| Class 5 Creditors Balloon (64%) in 42nd month | | | | | | | | | | | | | | | | | | | see below |
| Taxes Paid pursuant reorg plan (64% $140,880 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | 2,444 | **2,444** | 2,444 |
| | | | | | | | | | | | | | | | | | | | |
| Total Debt Service | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 99,012 | 118,212 |
| | | | | | | | | | | | | | | | | | | | |
| Leasing & Capital Costs | | | | | | | | | | | | | | | | | | | |
| Tenant Improvement | 1,160 | 3,466 | 1,982 | 2,742 | 1,644 | 3,074 | 1,547 | 646 | 585 | 2,433 | 582 | 1,997 | 2,613 | 2,833 | 1,328 | 2,073 | 2,505 | 1,187 | 2,711 |
| Leasing Commissions (6% / 2% | 3,191 | 9,536 | 4,908 | 7,159 | 3,319 | 7,795 | 3,522 | 1,611 | 1,718 | 8,236 | 1,710 | 4,306 | 7,365 | 8,064 | 3,902 | 6,089 | 6,762 | 3,064 | 6,642 |
| Capital Expenditures 12 sq f | 792 | 792 | 792 | 792 | 792 | 792 | 791 | 816 | 816 | 816 | 815 | 816 | 816 | 816 | 816 | 816 | 816 | 816 | 815 |
| | | | | | | | | | | | | | | | | | | | |
| Total Leasing & Capital Cost | 5,143 | 13,794 | 7,682 | 10,693 | 5,755 | 11,661 | 5,860 | 3,073 | 3,119 | 11,991 | 3,107 | 7,119 | 10,794 | 11,712 | 6,046 | 8,978 | 10,082 | 5,067 | 10,168 |
| | | | | | | | | | | | | | | | | | | | |
| Cash Flow After Debt Service | **$25,010** | **$14,524** | **$19,001** | **$21,457** | **$24,470** | **$27,236** | **($40,121)** | **$36,186** | **$33,728** | **$31,423** | **($46,631)** | **$29,712** | **$27,885** | **$30,773** | **$33,716** | **$36,428** | **$29,869** | **$38,268** | **($65,521)** |
| But Before Taxes | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| Cummulative Cash on Hand | $400,941 | $415,465 | $434,465 | $455,922 | $480,392 | $507,627 | $467,506 | $503,691 | $537,419 | $568,841 | $522,210 | $551,921 | $579,806 | $610,578 | $644,294 | $680,721 | $710,590 | $748,857 | $683,336 |
| | | | | | | | | | | | | | | | | | | | |
| Cash Flow Before DS | $124,022 | $113,536 | $118,013 | $120,469 | $123,482 | $126,248 | $58,891 | $135,198 | $132,740 | $130,435 | $52,381 | $128,724 | $126,897 | $129,785 | $132,728 | $135,440 | $128,881 | $137,280 | $52,691 |
| DSCR | 1.25 | 1.15 | 1.19 | 1.22 | 1.25 | 1.28 | 0.59 | 1.37 | 1.34 | 1.32 | 0.53 | 1.30 | 1.32 | 1.34 | 1.37 | 1.37 | 1.30 | 1.39 | 0.45 |

**Building Sale at 42nd Month --->**

| | | |
|---|---|---|
| Cost of sale (5%) | Building Sale at 42nd Month | $ 23,222,800 |
| Pay off Unsecured Creditors Balloon (64%) in 42nd | Cost of sale (5%) | $ 1,161,140 |
| Pay off of Principal | Pay off of Principal | $ 16,546,449 |
| Proceeds from Sale | Pay off Class 5 Creditors Balloon (64%) in 42nd | $ 1,658,523 |
| | Proceeds from Sale | $ 3,856,688 |

**Building Refinance at 42nd Month --->**

| | | |
|---|---|---|
| Cost of refinance (1.5%) | Building Refinance at 42nd Month | $ 19,500,000 |
| Pay off Unsecured Creditors Balloon (64%) in 42nd | Cost of Refinance (1.5%) | $ 292,500 |
| Pay off of Principal | Pay off of Principal | $ 16,546,449 |
| | Pay off Class 5 Creditors Balloon (64%) in 42nd | $ 1,658,523 |
| | Proceeds from Refinance | $ 1,002,528 |

2

Exhibit C

**San Juan Capistrano North**     29122 Rancho Viejo Rd
Schedule Of Prospective Cash Flow     San Juan Capistrano, CA 92675
**3.5 Year Projections**

*Note 36% = Pro Rata share for North Building
64% = Pro Rata share for South Building

| For the Months | PLAN START Jun-2010 | Month 1 Jul-2010 | Month 2 Aug-2010 | Month 3 Sep-2010 | Month 4 Oct-2010 | Month 5 Nov-2010 | Month 6 Dec-2010 | Month 7 Jan-2011 | Month 8 Feb-2011 | Month 9 Mar-2011 | Month 10 Apr-2011 | Month 11 May-2011 | Month 12 Jun-2011 | Month 13 Jul-2011 | Month 14 Aug-2011 | Month 15 Sep-2011 | Month 16 Oct-2011 | Month 17 Nov-2011 | Month 18 Dec-2011 | Month 19 Jan-2012 | Month 20 Feb-2012 | Month 21 Mar-2012 | Month 22 Apr-2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual Occupancy | 40.78% | 45.13% | 48.53% | 50.95% | 53.86% | 59.67% | 61.60% | 71.29% | 72.26% | 74.60% | 79.03% | 82.60% | 89.30% | 90.29% | 95.62% | 98.53% | 99.98% | 99.98% | 99.98% | 99.98% | 96.10% | 94.65% | 95.63% |
| **Potential Gross Revenue** | | | | | | | | | | | | | | | | | | | | | | | |
| Base Rental Revenue | $40,989 | $43,629 | $46,716 | $50,242 | $52,882 | $58,766 | $62,155 | $68,314 | $68,320 | $70,442 | $74,506 | $77,755 | $81,835 | $86,146 | $91,125 | $91,124 | $91,129 | $91,277 | $91,274 | $91,442 | $91,687 | $91,754 | $92,026 |
| Absorption & Turnover Vacancy | (1,320) | (5,835) | (1,980) | (1,760) | (1,760) | (2,640) | (4,407) | (1,767) | (3,522) | (3,522) | (2,123) | (2,123) | | | | | | | | | (3,698) | (5,085) | (4,149) |
| Base Rent Abatement | (660) | (5,935) | (1,980) | (6,163) | (3,961) | (4,193) | (5,941) | (3,081) | (8,300) | (3,964) | (5,462) | (5,281) | (2,684) | (6,119) | (3,393) | (6,122) | (3,091) | (5,109) | (1,320) | (1,697) | | | |
| Scheduled Base Rental Revenue | 39,009 | 37,694 | 44,736 | 42,319 | 47,161 | 51,933 | 51,807 | 63,466 | 56,438 | 62,956 | 66,921 | 70,351 | 79,151 | 76,387 | 83,772 | 83,682 | 88,038 | 86,168 | 89,954 | 89,745 | 87,989 | 86,669 | 87,877 |
| Expense Reimbursement Revenue | | | | | | | | 1,432 | 1,340 | 1,331 | 1,296 | 1,299 | 1,291 | 1,221 | 1,178 | 1,196 | 1,187 | 1,190 | 1,204 | 1,971 | 1,841 | 1,832 | 1,723 |
| Janitoria | 410 | 436 | 467 | 502 | 529 | 588 | 622 | 683 | 683 | 704 | 745 | 778 | 818 | 851 | 911 | 911 | 911 | 913 | 913 | 914 | 913 | 917 | 918 |
| **Total Potential Gross Revenue** | 39,419 | 38,130 | 45,203 | 42,821 | 47,690 | 52,521 | 52,429 | 65,581 | 58,461 | 64,991 | 68,962 | 72,428 | 81,260 | 78,459 | 85,861 | 85,789 | 90,136 | 88,271 | 92,071 | 92,630 | 90,747 | 89,419 | 90,520 |
| Collection Loss | (384) | (384) | (383) | (384) | (383) | (384) | (383) | (756) | (756) | (756) | (756) | (756) | (756) | (756) | (756) | (756) | (756) | (756) | (757) | (826) | (826) | (826) | (826) |
| **Effective Gross Revenue** | 39,035 | 37,746 | 44,820 | 42,437 | 47,307 | 52,137 | 52,046 | 64,825 | 57,705 | 64,235 | 68,206 | 71,672 | 80,504 | 77,703 | 85,105 | 85,033 | 89,380 | 87,515 | 91,314 | 91,804 | 89,921 | 88,593 | 89,694 |
| **Operating Expense** | | | | | | | | | | | | | | | | | | | | | | | |
| Alarm Monitoring | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 |
| Elevator Maintenance | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 |
| HVAC | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| Insurance | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 |
| Janitoria | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 |
| Landscaping | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 |
| Maintenance & Repairs | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Pest Control | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 |
| Pool/Fount Main | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 |
| Property Mgmt Fee | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 |
| Property Taxes | | | | | | | 41,381 | | | | 41,383 | | | | | | | | 42,209 | | | | 42,210 |
| Security Patrol | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Sweeping | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Trash Removal | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 |
| Utilities | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 |
| NR Advertising | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| NR Directors/Door Names | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| NR Janitoria | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 |
| NR Leasing | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 |
| NR Maintenance & Repairs | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| NR Turnover Exp | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| NR Utilities | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |
| Chapter 11 Administrative Fee (36%) | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 |
| PROMOTION (phone and internet) | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 800 | 800 | 800 |
| MISC/Contingency | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| OPERATING EXPENSES | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 |
| **Total Operating Expense** | 13,921 | 13,921 | 14,121 | 14,321 | 14,321 | 14,321 | 55,702 | 14,321 | 14,321 | 14,321 | 55,704 | 14,321 | 14,321 | 14,321 | 14,321 | 14,321 | 14,321 | 14,321 | 56,530 | 14,121 | 14,121 | 14,121 | 56,131 |
| **Net Operating Income** | 25,114 | 23,825 | 30,699 | 28,116 | 32,986 | 37,816 | (3,656) | 50,504 | 43,384 | 49,914 | 12,502 | 57,351 | 66,183 | 63,382 | 70,784 | 70,712 | 75,059 | 73,194 | 34,784 | 77,683 | 75,800 | 74,472 | 33,563 |
| **Debt Service** (interest rate) | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 5.50% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.50% | 6.50% | 6.50% | 6.50% | 6.50% |
| Interest Payments (Principal $9,307,255) | | | | | | | | | | | | | | | | | | | | | | | |
| Class 4 Creditors Interest at 3% ($30,000*36%) | 38,780 | 38,780 | 38,780 | 38,780 | 38,780 | 38,780 | 42,658 | 42,658 | 42,658 | 42,658 | 42,658 | 42,658 | 46,536 | 46,536 | 46,536 | 46,536 | 46,536 | 46,536 | 50,414 | 50,414 | 50,414 | 50,414 | 50,414 |
| Class 4 Creditors Balloon ($30,000 *36%) in month 4 | | | | | | | | | | | | | | | | | | | | | | | |
| Class 5 Balloon Payment in Month 42 (36%) | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| Taxes Paid pursuant reorg plan (36% of $140,880) | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 |
| **Total Debt Service** | 40,182 | 40,182 | 40,182 | 40,182 | 40,182 | 40,182 | 44,060 | 44,060 | 44,060 | 44,060 | 44,060 | 44,060 | 47,938 | 47,938 | 47,938 | 47,938 | 47,938 | 47,938 | 51,816 | 51,816 | 51,816 | 51,816 | 51,816 |
| **Leasing & Capital Costs** | | | | | | | | | | | | | | | | | | | | | | | |
| Tenant Improvements | 945 | 405 | | | | 540 | | 834 | 558 | | 1,113 | | 671 | | | | 834 | 417 | | | | | 1,146 |
| Leasing Commissions (6% / 2%) | 11,707 | 5,018 | 4,550 | 5,841 | 3,892 | 10,581 | 5,192 | 11,331 | 5,398 | 3,129 | 6,883 | 4,784 | 7,651 | 5,221 | 9,080 | 2,251 | 1,126 | | | | | | 3,154 |
| Capital Expenditure | 413 | 413 | 413 | 413 | 413 | 413 | 413 | 425 | 425 | 426 | 425 | 426 | 425 | 426 | 425 | 426 | 425 | 426 | 426 | 438 | 438 | 438 | 438 |
| **Total Leasing & Capital Costs** | 13,065 | 5,826 | 4,963 | 6,254 | 4,305 | 11,534 | 5,620 | 12,590 | 6,381 | 3,555 | 8,421 | 5,210 | 8,748 | 5,906 | 9,506 | 3,510 | 1,969 | 425 | 426 | 438 | 438 | 438 | 4,738 |
| **Cash Flow After Debt Service** | (28,133) | (22,192) | (14,446) | (18,319) | (11,501) | (13,900) | (53,321) | (6,146) | (7,057) | 2,300 | (39,979) | 8,081 | 9,499 | 9,799 | 13,340 | 19,264 | 25,153 | 24,831 | (17,458) | 25,430 | 23,546 | 22,218 | (22,991) |
| New Value Contribution $300,000 to cover interest | (28,133) | (22,192) | (14,446) | (18,319) | (11,501) | (13,900) | (53,321) | (6,146) | (7,057) | | (39,979) | | | | | | | | (17,458) | | | | (22,991) |
| New Value Contribution Balance | $271,867 | $249,675 | $235,229 | $216,910 | $205,409 | $191,509 | $138,188 | $132,042 | $124,986 | $127,285 | $87,307 | $95,387 | $104,886 | $114,685 | $128,025 | $147,290 | $172,442 | $197,273 | $179,815 | $205,245 | $228,791 | $251,009 | $228,018 |
| **Cash Flow** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,300 | $0 | $8,081 | $9,499 | $9,799 | $13,340 | $19,264 | $25,153 | $24,831 | $0 | $25,430 | $23,546 | $22,218 | $0 |
| Cash Flow Before DS | $12,049 | $17,989 | $25,736 | $21,862 | $28,681 | $26,282 | (9,261) | $37,914 | $37,003 | $46,359 | $4,081 | $52,141 | $57,436 | $57,736 | $61,278 | $67,202 | $73,090 | $72,769 | $34,358 | $77,245 | $75,362 | $74,034 | $28,825 |
| DSCR | | | 0.64 | 0.54 | 0.71 | 0.65 | -0.21 | 0.86 | 0.84 | 1.05 | 0.09 | 1.18 | 1.20 | 1.18 | 1.28 | 1.40 | 1.52 | 1.54 | 0.66 | 1.49 | 1.45 | 1.43 | 0.56 |

**Building Sale at 42nd Month --->**

| Building Sale at 42nd Month | $12,315,880 | 6.5 CAP |
|---|---|---|
| Cost of sale (5%) | $ 615,794 | |
| Pay off Principal | $ 9,307,255 | |
| Pay off Class 5 Creditors Balloon (36%) in 42nd | $ 932,919 | |
| Proceeds from Sale | $ 1,656,674 | |

Cost of sale (5%) in 42nd
Pay off Unsecured Creditors Balloon (36%) in 42nd
Pay off Principal
Proceeds from Sale

**Building Refinance at 42nd Month --->**

| Building Refinance at 42nd Month | $10,800,000 |
|---|---|
| Cost of refinance (1.5%) | $ 210,000.00 |
| Pay off Principal | $ 9,307,255 |
| Pay off Class 5 Creditors Balloon (36%) in 42nd | $ 932,919 |
| Proceeds from Refinance | $ 349,826 |

Cost of refinance (1.5%)
Pay off Unsecured Creditors Balloon (36%) in 42nd
Pay off Principal
Proceeds from Refinance

1

Exhibit C

*Note 36% = Pro Rata share for North Building
64% = Pro Rata share for South Building

| For the Months | Month 23 May-2012 | Month 24 Jun-2012 | Month 25 Jul-2012 | Month 26 Aug-2012 | Month 27 Sep-2012 | Month 28 Oct-2012 | Month 29 Nov-2012 | Month 30 Dec-2012 | Month 31 Jan-2013 | Month 32 Feb-2013 | Month 33 Mar-2013 | Month 34 Apr-2013 | Month 35 May-2013 | Month 36 Jun-2013 | Month 37 Jul-2013 | Month 38 Aug-2013 | Month 39 Sep-2013 | Month 40 Oct-2013 | Month 41 Nov-2013 | Month 42 Dec-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual Occupancy | 97.08% | 89.81% | 85.45% | 92.22% | 92.22% | 92.71% | 85.45% | 84.48% | 86.42% | 85.44% | 92.79% | 90.87% | 89.63% | 94.75% | 91.17% | 89.63% | 87.39% | 89.32% | 95.13% | 97.07% |
| **Potential Gross Revenue** | | | | | | | | | | | | | | | | | | | | |
| Base Rental Revenue | $92,034 | $92,447 | $92,596 | $92,750 | $93,054 | $93,245 | $93,597 | $93,774 | $96,574 | $97,186 | $97,515 | $98,479 | $99,036 | $100,001 | $100,556 | $101,895 | $102,365 | $102,649 | $102,813 | $102,928 |
| Absorption & Turnover Vacancy | (2,763) | (9,702) | (13,860) | (7,399) | (7,401) | (6,933) | (13,860) | (14,786) | (14,232) | (15,253) | (7,542) | (9,559) | (10,855) | (10,776) | (11,120) | (11,206) | (10,164) | (4,574) | (4,574) | (1,524) |
| Base Rent Abatement | (3,218) | (1,729) | (3,230) | (693) | (6,233) | (2,079) | (6,471) | (4,159) | (4,074) | (8,178) | (3,420) | (11,181) | (4,579) | (7,376) | (6,098) | (3,100) | (7,067) | (3,920) | (7,071) | (3,570) |
| Scheduled Base Rental Revenue | 86,053 | 81,016 | 75,506 | 84,658 | 79,420 | 84,233 | 73,266 | 74,829 | 78,268 | 73,755 | 86,553 | 77,739 | 83,602 | 81,849 | 83,338 | 87,589 | 85,134 | 94,155 | 94,218 | 99,358 |
| Expense Reimbursement Revenue | 1,753 | 1,408 | 1,302 | 1,153 | 1,046 | 957 | 585 | 517 | 780 | 700 | 692 | 586 | 561 | 450 | 415 | 315 | 274 | 274 | 241 | 292 |
| Janitoria | 920 | 924 | 926 | 928 | 931 | 932 | 936 | 938 | 966 | 972 | 975 | 985 | 990 | 1,000 | 1,006 | 1,019 | 1,024 | 1,026 | 1,028 | 1,029 |
| **Total Potential Gross Revenue** | 88,726 | 83,348 | 77,734 | 86,739 | 81,397 | 86,122 | 74,787 | 76,284 | 80,014 | 75,427 | 88,220 | 79,310 | 85,153 | 83,299 | 84,759 | 88,923 | 86,432 | 95,455 | 95,507 | 100,679 |
| Collection Loss | (826) | (826) | (826) | (826) | (826) | (826) | (826) | (827) | (855) | (855) | (854) | (855) | (855) | (854) | (855) | (855) | (854) | (855) | (854) | (855) |
| **Effective Gross Revenue** | 87,900 | 82,522 | 76,908 | 85,913 | 80,571 | 85,296 | 73,961 | 75,457 | 79,159 | 74,572 | 87,366 | 78,455 | 84,298 | 82,445 | 83,904 | 88,068 | 85,578 | 94,600 | 94,653 | 99,824 |
| **Operating Expense** | | | | | | | | | | | | | | | | | | | | |
| Alarm Monitoring | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 | 378 |
| Elevator Maintenance | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 | 310 |
| HVAC | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| Insurance | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 | 681 |
| Janitoria | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 | 913 |
| Landscaping | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 |
| Maintenance & Repairs | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Pest Control | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 |
| Pool/Fount Main | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 |
| Property Mgmt Fee | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 |
| Property Taxes | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 43,053 | 2,080 | 2,080 | 2,080 | 43,054 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 2,080 | 43,914 |
| Security Patrol | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Sweeping | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Trash Removal | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 |
| Utilities | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 | 1,498 |
| NR Advertising | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| NR Directors/Door Names | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| NR Janitoria | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 | 352 |
| NR Leasing Exp | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 |
| NR Maintenance & Repair | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| NR Turnover Exp | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| NR Utilities | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |
| Chapter 11 Administrative Fee (36%) | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 |
| PROMOTION (phone and internet) | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| MISC/Contingency | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| OPERATING EXPENSES | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 | 1,193 |
| **Total Operating Expense** | 13,721 | 13,721 | 13,721 | 13,721 | 13,721 | 13,721 | 13,721 | 56,774 | 13,721 | 13,721 | 13,721 | 56,775 | 13,721 | 13,721 | 13,721 | 13,721 | 13,721 | 13,721 | 13,721 | 57,635 |
| **Net Operating Income** | 74,179 | 68,801 | 63,187 | 72,192 | 66,850 | 71,575 | 60,240 | 18,683 | 65,438 | 60,851 | 73,645 | 21,680 | 70,577 | 68,724 | 70,183 | 74,347 | 71,857 | 80,879 | 80,932 | 42,189 |
| **Debt Service** (interest rate) | 6.50% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% |
| Interest Payments (Principal $9,307,255) | 50,414 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 | 54,292 |
| Class 4 Creditors Interest at 3% ($30,000 * 36%) | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| Class 4 Creditors Balloon ($30,000 * 36%) in month 42 (36%) | | | | | | | | | | | | | | | | | | | | 10,800 |
| Class 5 Balloon Payment in Month 42 (36%) | | | | | | | | | | | | | | | | | | | | see below |
| Taxes Paid pursuant reorg plan (36% of $140,880) | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 | 1,374 |
| **Total Debt Service** | 51,816 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 55,694 | 66,494 |
| **Leasing & Capital Costs** | | | | | | | | | | | | | | | | | | | | |
| Tenant Improvement | 430 | 856 | | 3,008 | 1,289 | 1,005 | 1,290 | 859 | 3,540 | 1,181 | 2,950 | 1,477 | 712 | 2,063 | 1,088 | 2,040 | 1,188 | 2,065 | 885 | 443 |
| Leasing Commissions (6% / 2%) | 1,182 | 2,356 | | 8,274 | 3,546 | 2,764 | 3,548 | 2,364 | 10,400 | 3,469 | 8,667 | 4,340 | 2,091 | 6,061 | 3,196 | 5,993 | 3,489 | 6,067 | 2,600 | 1,300 |
| Capital Expenditure | 438 | 439 | 438 | 438 | 438 | 438 | 438 | 439 | 451 | 451 | 451 | 452 | 451 | 451 | 452 | 451 | 451 | 452 | 451 | 452 |
| **Total Leasing & Capital Costs** | 2,050 | 3,651 | 438 | 11,720 | 5,273 | 4,207 | 5,276 | 3,662 | 14,391 | 5,101 | 12,068 | 6,269 | 3,254 | 8,575 | 4,736 | 8,484 | 5,128 | 8,584 | 3,936 | 2,195 |
| Cash Flow After Debt Service | $20,314 | $9,457 | $7,055 | $4,778 | $5,883 | $11,675 | ($730) | ($40,673) | ($4,647) | $56 | $5,883 | ($40,283) | $11,630 | $4,455 | $9,753 | $10,169 | $11,035 | $16,602 | $21,302 | ($26,500) |
| New Value Contribution $300,000 to cover interest | $0 | $0 | $0 | $0 | $0 | $0 | $730 | $40,673 | $4,647 | $0 | $0 | $40,283 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $26,500 |
| New Value Contribution Balance | $248,332 | $257,788 | $264,844 | $269,621 | $275,504 | $287,179 | $286,449 | $245,776 | $241,129 | $241,185 | $247,068 | $206,785 | $218,415 | $222,870 | $232,623 | $242,792 | $253,827 | $270,428 | $291,731 | $265,231 |
| **Cash Flow** | $20,314 | $9,457 | $7,055 | $4,778 | $5,883 | $11,675 | $0 | $0 | $0 | $56 | $5,883 | $0 | $11,630 | $4,455 | $9,753 | $10,169 | $11,035 | $16,602 | $21,302 | $0 |
| Cash Flow Before DS | $72,129 | $65,150 | $62,749 | $60,472 | $61,577 | $67,368 | $54,964 | $15,021 | $51,047 | $55,750 | $61,577 | $15,411 | $67,323 | $60,149 | $65,447 | $65,863 | $66,729 | $72,295 | $76,996 | $39,994 |
| DSCR | 1.39 | 1.17 | 1.13 | 1.09 | 1.11 | 1.21 | 0.99 | 0.27 | 0.92 | 1.00 | 1.11 | 0.28 | 1.21 | 1.08 | 1.18 | 1.18 | 1.20 | 1.30 | 1.38 | 0.60 |

**Building Sale at 42nd Month --->**

| | | |
|---|---|---|
| Cost of sale (5%) in 42nd | | |
| Pay off Unsecured Creditors Balloon (36%) in 42nd | | |
| Proceeds from Sale | | |
| Building Sale at 42nd Month | $ | 12,315,880 |
| Cost of sale (5%) | $ | 615,794 |
| Pay off Principal | $ | 9,307,255 |
| Pay off Class 5 Creditors Balloon (36%) in 42n | $ | 932,919 |
| Proceeds from Sale | $ | 1,459,912 |

**Building Refinance at 42nd Month --->**

| | | |
|---|---|---|
| Cost of refinance (1.5%) | | |
| Pay off Unsecured Creditors Balloon (36%) in 42nd | | |
| Pay off Principal | | |
| Proceeds from Refinance | | |
| Building Refinance at 42nd Month | $ | 10,800,000 |
| Cost of refinance (1.5%) | $ | 162,000.00 |
| Pay off Principal | $ | 9,307,255 |
| Pay off Class 5 Creditors Balloon (36%) in 42n | $ | 932,919 |
| Proceeds from Refinance | $ | 397,826 |

1

2

### EXHIBIT D – UNEXPIRED LEASES TO BE ASSUMED:

| LEASES | ARREARS/DMGS | METHODS OF CURE |
|---|---|---|
| ·Description = office lease<br><br>·Lessor's name = Mammoth San Juan Capistrano I LLC<br><br>·Lessee's name = MAMMOTH SAN JUAN CAPISTRANO I LLC<br><br>·Expiration date = vary | ·Default amt = 0<br>·Actual pecuniary loss  =0 | ·Method of curing default & loss = Not Applicable |
|  |  |  |

**CORCOVELOS LAW GROUP**
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

1

**EXHIBIT E– LIST OF GENERAL UNSECURED CREDITORS**

| | |
|---|---|
| Cox Communications | First American Fire Safety |
| PennySaver | California Backflow Service |
| Bishop Networks | Law Offices of Dan Carlton |
| Western Exterminator | Access Security Controls |
| California Coast Plumbers | Big Mike Electric |
| Water Systems Maintenance | Richard Cohen Landscape |
| Hopart, Inc. | ThyssenKrupp Elevator |
| Terra Pacific Landscape | The Ritz Companies |
| Mammoth Equities Property Management Inc. | Mr. Robert Wish |
| Pacific Mercantile Bank | Mammoth Equities, LLC |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

**EXHIBIT F— LIST OF EQUITY INTEREST HOLDERS**

| Name | % Interest |
|---|---|
| GAIL V. ANDERSON,IRA | 0.25 |
| WALTCO OF NEVADA PROFIT SHARING PLAN | 12 |
| JOHN F. DEBS & ANNE R. DEBS | 0.5 |
| FARREL G. HINKLE & ANNE HINKLE Trustees | 1 |
| HARRY MARINOW Family Trust | 1 |
| EDWARD MILLER Trustee Miller Family Trust | 0.5 |
| ALAN PEKARCIK Alan Steven Inc Profit Sharing Trust | 0.75 |
| LEE ROTSHECK PLDC Inc Pension Fund | 0.5 |
| JOSEPH A. RYERSON | 0.5 |
| DANIEL N. VITTONE | 0.25 |
| DR. GAIL V. ANDERSON | 0.25 |
| Charles Schwab Inc. | 1 |
| DR. WILLIAM L. BERNSTEIN | 0.5 |
| AMBER V. WISH | 0.5 |
| POTAWATOMI CAPITAL COMPANY | 2.5 |
| GLORIA M ST. AMANT, Trustee | 0.25 |
| PHILLIP J. & KATHLEEN M. RODRIGUEZ, Defined Benefit Plan | 0.5 |
| ROGER PETERSEN, Peterson Aluminum Sales Inc., Profit Sharing Trust | 1 |
| ROBERT MITCHELL | 0.5 |
| JOSEPH & MICHELLE MC ALEER Trustee | 0.25 |
| KONIAG DEVELOPMENT CORPORATION | 2.5 |
| BERT FERRARI | 0.5 |

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

| | | |
|---|---|---|
| 1 | CDC CAPISTRANO PARTNERS, LLC | 13 |
| 2 | DR. WILLIAM L. BERNSTEIN | 1.5 |
| 3 | RAYMOND C. CAMERO Trustee of Camero | 1 |
| 4 | Trust | |
| 5 | DAVID CLARK, Trustee of Clark, Law Firm PC | 0.5 |
| 6 | 401K Plan | |
| 7 | DR. THOMAS C. GATES | |
| 8 | Med Corp Retirement Trust | 1 |
| 9 | CRAIG C. LACY IRA | 0.5 |
| 10 | ROCHELLE MC ALEER IRA | 0.5 |
| 11 | OUZINKIE NATIVE CORPORATION | 2.5 |
| 12 | PACIFIC METROPOLITAN PROPERTIES, INC. | 0.5 |
| 13 | PLDC INC. PENSION ACCOUNT | |
| 14 | DR. WILLIAM RUSSELL, Ameritrade Custodian | 0.5 |
| 15 | FBO Russell | |
| 16 | DR. RICHARD TAKETA | |
| 17 | NHRA Med Grp 401K | 0.5 |
| 18 | FRANK C. WISH | 0.5 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1          **EXHIBIT G- LAST TWO YEARS FINANCIAL STATEMENTS**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREETSUITE 150
MANHATTAN BEACH, CALIFORNIA 90266

## MAMMOTH SAN JUAN CAPISTRANO
## BALANCE SHEET
As At December 31, 2008

June 15, 2009  5:49 PM

Page 1

|  | YTD Actual |
|---|---|
| **A S S E T S** | |
| **CURRENT ASSETS** | |
| CASH IN BANK | 4,158.00 |
| ACCOUNTS RECEIVABLE | 50,765.39 |
| A/R TENANT REIMBURSEMENTS | 529.47 |
| ALLOWANCE FOR BAD DEBTS | (36,863.09) |
| TOTAL CURRENT ASSETS | 18,589.77 |
| | |
| **FIXED ASSETS** | |
| LAND | 4,037,276.00 |
| BUILDING | 22,441,882.91 |
| ACCUM DEPR - BUILDINGS | (1,272,127.67) |
| TENANT IMPROVEMENTS | 7,488.24 |
| BUILDING IMPROVEMENTS | 184,474.26 |
| ACCUMULATED DEPR - IMPROVEMENTS | (3,042.41) |
| TOTAL FIXED ASSETS | 25,395,951.33 |
| | |
| **OTHER ASSETS** | |
| ARTIFACTS | 5,000.00 |
| LEASING COMMISSION | 265,277.95 |
| AMORT OF LEASING COMMISSIONS | (158,549.23) |
| PREPAID LEASING COMMISSIONS | 1,093.50 |
| LOAN FEES | 107,776.25 |
| ACCUM AMORT - LOAN FEES | (107,775.76) |
| TOTAL OTHER ASSETS | 112,822.71 |
| | |
| TOTAL ASSETS | 25,527,363.81 |
| | |
| **L I A B I L I T I E S  &  C A P I T A L** | |
| **LIABILITIES** | |
| **CURRENT LIABILITIES** | |
| ACCOUNTS PAYABLE | 223,912.62 |
| PREPAID RENTS | 42,356.19 |
| REFUNDABLE TENANT DEPOSITS | 66,472.00 |
| SHORT TERM LOANS PAYABLE | 437,000.00 |
| TOTAL CURRENT LIABILITIES | 769,740.81 |
| | |
| **LONG TERM LIABILITIES** | |
| NOTES PAYABLE - PMB (LAND LOANS ONLY) | 655,863.00 |
| NOTES PAYABLE - WASHINGTON MUTUAL | 23,500,000.00 |
| NOTES PAYABLE - ME, LLC | 1,098,600.00 |
| TOTAL LONG TERM LIABILITIES | 25,254,463.00 |
| | |
| TOTAL LIABILITIES | 26,024,203.81 |
| | |
| **CAPITAL** | |

Exhibit G to Disclosure Statement for Debtor Mammoth San Juan Capistrano I, LLC

**MAMMOTH SAN JUAN CAPISTRANO**
**BALANCE SHEET**
As At December 31, 2008

June 15, 2009  5:49 PM
Page 2

|  | YTD Actual |
|---|---|
| CAPITAL | 1,865,286.84 |
| NET PROFIT/(LOSS) | (2,362,126.84) |
| TOTAL CAPITAL | (496,840.00) |
| TOTAL LIABILITIES & CAPITAL | 25,527,363.81 |

**MAMMOTH SAN JUAN CAPISTRANO**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2008

June 15, 2009  5:49 PM
Page 1

| | YTD Actual |
|---|---|
| **REVENUE** | |
| MINIMUM RENTS | 1,823,053.34 |
| ABATED RENT | (143,774.32) |
| JANITORIAL SERVICE | 36,602.38 |
| EARLY LEASE TERMINATION FEE | 30,490.00 |
| LATE CHARGES | 3,823.30 |
| NSF CHARGES | 100.00 |
| WRITEOFFS | (15,011.97) |
| INTEREST EARNED | 2,079.16 |
| MISCELLANEOUS INCOME | (1,000.00) |
| | |
| GROSS REVENUE | 1,736,361.89 |
| | |
| **COMMON AREA MAINTENANCE** | |
| ALARM MONITORING/MAINT-(CAM) | 4,959.14 |
| ELECTRICAL REPAIRS (CAM) | 2,626.50 |
| ELEVATOR MAINT./(CAM) | 11,959.57 |
| HVAC-(CAM) | 37,825.91 |
| INSURANCE-LIABILITY (CAM) | 22,239.64 |
| JANITORIAL (CAM) | 50,775.13 |
| LANDSCAPING (CAM) | 54,889.50 |
| LOCKS & KEYS (CAM) | 1,021.44 |
| MAINTENANCE-(CAM) | 21,723.90 |
| MISCELLANEOUS (CAM) | 485.96 |
| PARKING LOT MAINTENANCE (CAM) | 572.43 |
| PARKING LOT LIGHTING M&R (CAM) | 1,797.47 |
| PEST CONTROL (CAM) | 5,580.00 |
| POOL/FOUNTAIN MAINT/(CAM) | 15,867.50 |
| PROPERTY MANAGEMENT FEE (CAM) | 83,874.96 |
| PROPERTY TAXES (CAM) | 225,859.51 |
| REPAIRS-CAM | 1,777.31 |
| SECURITY PATROL (CAM) | 9,765.00 |
| SIGNS (CAM) | 406.65 |
| SWEEPING (CAM) | 1,370.00 |
| TRASH REMOVAL (CAM) | 7,966.68 |
| UTILITIES | 51,437.03 |
| WINDOW CLEANING-(CAM) | 4,082.50 |
| | |
| TOTAL COMMON AREA MAINTENANCE | 618,863.73 |
| | |
| **BUILDING EXPENSES** | |
| ADVERTISING (BLDG.) | 35,648.31 |
| CONSULTING (BLDG) | 1,300.00 |
| DATA/CABLE/INTERNET (BLDG) | 363.00 |
| DIRECTORIES/DOOR NAMES-(BLDG) | 5,722.00 |
| ELECTRICAL REPAIRS (BLDG) | 1,598.00 |
| JANITORIAL--(BLDG) | 32,204.62 |
| LANDSCAPING (BLDG.) | 1,490.52 |
| LEASING EXPENSES-(BLDG) | 20,142.57 |
| TURNOVER EXPENSES | 15,444.72 |
| REPAIRS & MAINT.-BUILDING | 42,465.54 |

**MAMMOTH SAN JUAN CAPISTRANO**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2008

June 15, 2009  5:49 PM
Page 2

|  | YTD Actual |
|---|---|
| UTILITIES-BUILDING | 17,937.11 |
| **TOTAL BUILDING EXPENSES** | 174,316.39 |
| | |
| **OPERATING EXPENSES** | |
| ACCOUNTING EXPENSE | 8,001.50 |
| BAD DEBT EXPENSE | 36,863.09 |
| BANK CHARGES | 147.18 |
| CHARITABLE CONTRIBUTIONS | 674,000.00 |
| MANAGEMENT EXPENSE ALLOCATION | 23,330.86 |
| DUES & SUBSCRIPTIONS | 332.80 |
| ENTERTAINMENT | 53.64 |
| FEES & PERMITS | 1,966.06 |
| FORMS/LLC'S/SEC OF STATE | 20.00 |
| INTEREST EXPENSE | 1,632,353.41 |
| LEGAL EXPENSE | 94,485.85 |
| LOAN FEES | 14,970.55 |
| TELEPHONE EXPENSE | 32.15 |
| **TOTAL OPERATING EXPENSES** | 2,486,557.09 |
| **OTHER EXPENSES** | |
| AMORTIZATION | 169,146.52 |
| DEPRECIATION | 642,805.00 |
| FRANCHISE TAX | 6,800.00 |
| **TOTAL OTHER EXPENSES** | 818,751.52 |
| **NET PROFIT/(LOSS)** | (2,362,126.84) |

**MAMMOTH SAN JUAN CAPISTRANO**
**BALANCE SHEET**
As At December 31, 2009

January 15, 2010  10:34 AM
Page 1

|  | YTD Actual |
|---|---|
| **A S S E T S** | |
| **CURRENT ASSETS** | |
| ACCOUNTS RECEIVABLE | 200,041.16 |
| ALLOWANCE FOR BAD DEBTS | (53,882.34) |
| **TOTAL CURRENT ASSETS** | 146,158.82 |
| **FIXED ASSETS** | |
| LAND | 4,037,276.00 |
| BUILDING | 22,441,882.91 |
| ACCUM DEPR - BUILDINGS | (1,272,127.67) |
| TENANT IMPROVEMENTS | 17,772.57 |
| BUILDING IMPROVEMENTS | 184,474.26 |
| ACCUMULATED DEPR - IMPROVEMENTS | (3,042.41) |
| **TOTAL FIXED ASSETS** | 25,406,235.66 |
| **OTHER ASSETS** | |
| ARTIFACTS | 5,000.00 |
| LEASING COMMISSION | 275,696.19 |
| AMORT OF LEASING COMMISSIONS | (158,549.23) |
| PREPAID INSURANCE | 3,699.03 |
| LOAN FEES | 111,001.12 |
| ACCUM AMORT - LOAN FEES | (107,775.76) |
| **TOTAL OTHER ASSETS** | 129,071.35 |
| **TOTAL ASSETS** | 25,681,465.83 |
| **L I A B I L I T I E S   &   C A P I T A L** | |
| **LIABILITIES** | |
| **CURRENT LIABILITIES** | |
| ACCOUNTS PAYABLE | 174,346.46 |
| ACCRUED PROPERTY TAX | 125,305.65 |
| REFUNDABLE TENANT DEPOSITS | 70,484.50 |
| SHORT TERM LOANS PAYABLE | 1,092,334.00 |
| **TOTAL CURRENT LIABILITIES** | 1,462,470.61 |
| **LONG TERM LIABILITIES** | |
| NOTES PAYABLE - WASHINGTON MUTUAL | 23,500,000.00 |
| NOTES PAYABLE - ME, LLC | 1,099,129.00 |
| **TOTAL LONG TERM LIABILITIES** | 24,599,129.00 |
| **TOTAL LIABILITIES** | 26,061,599.61 |
| **CAPITAL** | |
| CAPITAL | (496,840.00) |
| NET PROFIT/(LOSS) | 116,706.22 |

**MAMMOTH SAN JUAN CAPISTRANO**
**BALANCE SHEET**
As At December 31, 2009

January 15, 2010  10:34 AM
Page 2

| | YTD Actual |
|---|---|
| TOTAL CAPITAL | (380,133.78) |
| TOTAL LIABILITIES & CAPITAL | 25,681,465.83 |

**MAMMOTH SAN JUAN CAPISTRANO**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2009

January 15, 2010  10:34 AM
Page 1

| | YTD Actual |
|---|---|
| **REVENUE** | |
| MINIMUM RENTS | 918,086.90 |
| ABATED RENT | (187,547.26) |
| JANITORIAL SERVICE | 14,609.50 |
| EARLY LEASE TERMINATION FEE | 16,000.00 |
| LATE CHARGES | 2,674.89 |
| NSF CHARGES | 50.00 |
| WRITEOFFS | (.50) |
| MISCELLANEOUS INCOME | 4,900.00 |
| | |
| GROSS REVENUE | 768,773.53 |
| | |
| **COMMON AREA MAINTENANCE** | |
| ALARM MONITORING/MAINT-(CAM) | 6,046.94 |
| ELECTRICAL REPAIRS (CAM) | 1,574.89 |
| ELEVATOR MAINT./(CAM) | 7,402.50 |
| FIRE EXTINGUISH./(CAM) | 199.62 |
| HVAC-(CAM) | 17,704.84 |
| INSURANCE-LIABILITY (CAM) | 12,048.49 |
| JANITORIAL (CAM) | 25,235.50 |
| LANDSCAPING (CAM) | 16,586.55 |
| LOCKS & KEYS (CAM) | 726.75 |
| MAINTENANCE-(CAM) | 11,819.65 |
| PARKING LOT LIGHTING M&R (CAM) | 1,014.18 |
| PEST CONTROL (CAM) | 2,440.00 |
| POOL/FOUNTAIN MAINT/(CAM) | 7,009.80 |
| PROPERTY MANAGEMENT FEE (CAM) | 33,529.54 |
| PROPERTY TAXES (CAM) | 113,893.32 |
| REPAIRS-CAM | 605.13 |
| SECURITY PATROL (CAM) | 4,800.00 |
| SWEEPING (CAM) | 1,096.00 |
| TRASH REMOVAL (CAM) | 4,031.82 |
| UTILITIES | 21,453.97 |
| | |
| TOTAL COMMON AREA MAINTENANCE | 289,219.49 |
| | |
| **BUILDING EXPENSES** | |
| ADVERTISING (BLDG.) | 5,357.95 |
| CONSULTING (BLDG) | 1,000.00 |
| DATA/CABLE/INTERNET (BLDG) | 1,304.16 |
| DIRECTORIES/DOOR NAMES-(BLDG) | 865.72 |
| JANITORIAL--(BLDG) | 16,784.80 |
| LEASING EXPENSES-(BLDG) | 21,695.30 |
| TURNOVER EXPENSES | 2,848.70 |
| REPAIRS & MAINT.-BUILDING | 3,936.65 |
| UTILITIES-BUILDING | 11,307.97 |
| | |
| TOTAL BUILDING EXPENSES | 65,101.25 |

**OPERATING EXPENSES**

**MAMMOTH SAN JUAN CAPISTRANO**

**INCOME STATEMENT**

For the 12 Months Ending December 31, 2009

January 15, 2010  10:34 AM

Page 2

|  | YTD Actual |
|---|---|
| ACCOUNTING EXPENSE | 8,678.50 |
| APPRAISAL FEES | 15,750.00 |
| BAD DEBT EXPENSE | 17,019.25 |
| MANAGEMENT EXPENSE ALLOCATION | 5,403.98 |
| INTEREST EXPENSE | 28,881.49 |
| LEGAL EXPENSE | 111,880.81 |
| LOAN FEES | 500.00 |
| MISCELLANEOUS EXPENSES | 27,918.91 |
| PENALTIES | 11,412.33 |
| PROFESSIONAL SERVICES | 57,501.30 |
| TOTAL OPERATING EXPENSES | 284,946.57 |
| **OTHER EXPENSES** | |
| FRANCHISE TAX | 12,800.00 |
| TOTAL OTHER EXPENSES | 12,800.00 |
| NET PROFIT/(LOSS) | 116,706.22 |

**M SJC I, LLC DEBTOR IN POSSESSION**
**BALANCE SHEET**
As At December 31, 2009

January 18, 2010  2:15 PM
Page 1

|  | YTD Actual |
|---|---|
| **A S S E T S** | |
| **CURRENT ASSETS** | |
| CASH IN BANK | 338,182.38 |
| ACCOUNTS RECEIVABLE | 81,361.34 |
| ALLOWANCE FOR BAD DEBTS | (85,513.50) |
| TOTAL CURRENT ASSETS | 334,030.22 |
| | |
| **FIXED ASSETS** | |
| TENANT IMPROVEMENTS | 3,240.00 |
| TOTAL FIXED ASSETS | 3,240.00 |
| | |
| **OTHER ASSETS** | |
| LEASING COMMISSION | 17,532.54 |
| PREPAID INSURANCE | (603.43) |
| TOTAL OTHER ASSETS | 16,929.11 |
| | |
| TOTAL ASSETS | 354,199.33 |
| | |
| **L I A B I L I T I E S  &  C A P I T A L** | |
| **LIABILITIES** | |
| **CURRENT LIABILITIES** | |
| ACCOUNTS PAYABLE | 39,810.15 |
| ACCRUED EXPENSES | 5,894.01 |
| PROPERTY TAX PAYABLE | 114,472.97 |
| PREPAID RENTS | 31,378.34 |
| REFUNDABLE TENANT DEPOSITS | 11,113.50 |
| TOTAL CURRENT LIABILITIES | 202,668.97 |
| | |
| **LONG TERM LIABILITIES** | |
| TOTAL LONG TERM LIABILITIES | 0.00 |
| | |
| TOTAL LIABILITIES | 202,668.97 |
| | |
| **CAPITAL** | |
| NET PROFIT/(LOSS) | 151,530.36 |
| TOTAL CAPITAL | 151,530.36 |
| | |
| TOTAL LIABILITIES & CAPITAL | 354,199.33 |

Exhibit G to Disclosure Statement for Plan of the Debtor M San Juan Capistrano I, LLC

**M SJC I, LLC DEBTOR IN POSSESSION**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2009

January 18, 2010  2:15 PM
Page 1

| | YTD Actual |
|---|---|
| **REVENUE** | |
| MINIMUM RENTS | 599,682.56 |
| ABATED RENT | (61,082.80) |
| JANITORIAL SERVICE | 8,803.84 |
| EARLY LEASE TERMINATION FEE | 3,520.00 |
| LATE CHARGES | 4,210.43 |
| | |
| GROSS REVENUE | 555,134.03 |
| | |
| **COMMON AREA MAINTENANCE** | |
| ALARM MONITORING/MAINT-(CAM) | 4,132.99 |
| ELECTRICAL REPAIRS (CAM) | 120.00 |
| ELEVATOR MAINT./(CAM) | 2,953.86 |
| HVAC-(CAM) | 10,108.00 |
| INSURANCE-LIABILITY (CAM) | 10,987.32 |
| JANITORIAL (CAM) | 10,342.87 |
| LANDSCAPING (CAM) | 13,444.91 |
| LOCKS & KEYS (CAM) | 43.05 |
| MAINTENANCE-(CAM) | 15,185.56 |
| PARKING LOT LIGHTING M&R (CAM) | 497.78 |
| PEST CONTROL (CAM) | 1,519.00 |
| POOL/FOUNTAIN MAINT/(CAM) | 6,859.80 |
| PROPERTY MANAGEMENT FEE (CAM) | 32,863.35 |
| PROPERTY TAXES (CAM) | 114,472.97 |
| SECURITY PATROL (CAM) | 4,400.00 |
| SWEEPING (CAM) | 822.00 |
| TRASH REMOVAL (CAM) | 4,041.84 |
| UTILITIES | 36,939.95 |
| | |
| TOTAL COMMON AREA MAINTENANCE | 269,735.25 |
| | |
| **BUILDING EXPENSES** | |
| ADVERTISING (BLDG.) | 4,200.61 |
| DATA/CABLE/INTERNET (BLDG) | 605.22 |
| DIRECTORIES/DOOR NAMES-(BLDG) | 1,689.64 |
| H.V.A.C. (BLDG.) | 2,525.44 |
| JANITORIAL--(BLDG) | 8,638.70 |
| LEASING EXPENSES-(BLDG) | 12,811.45 |
| TURNOVER EXPENSES | 7,445.30 |
| REPAIRS & MAINT.-BUILDING | 4,531.97 |
| UTILITIES-BUILDING | 6,584.36 |
| | |
| TOTAL BUILDING EXPENSES | 49,032.69 |
| | |
| **OPERATING EXPENSES** | |
| BAD DEBT EXPENSE | 85,513.50 |
| MANAGEMENT EXPENSE ALLOCATION | 14,986.14 |
| MISCELLANEOUS EXPENSES | (27,918.91) |
| PROFESSIONAL SERVICES | 4,000.00 |
| PROMOTION | 8,255.00 |

**M SJC I, LLC DEBTOR IN POSSESSION**
**INCOME STATEMENT**
For the 12 Months Ending December 31, 2009

January 18, 2010  2:15 PM
Page 2

|  | YTD Actual |
|---|---|
| TOTAL OPERATING EXPENSES | 84,835.73 |
| **OTHER EXPENSES** | |
| NET PROFIT/(LOSS) | 151,530.36 |

1           **EXHIBIT H- AGREEMENT FOR RESTRUCTURING**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORCOVELOS LAW GROUP
ATTORNEYS AT LAW
1001 SIXTH STREET SUITE 150
MANHATTAN BEACH, CALIFORNIA 90266